# In the United States Court of Federal Claims

No. 16-1545L

(Filed: March 23, 2021)

|  |  |
|---|---|
| **FRANK PENNA and** | ) |
| **LISA PENNA,** | ) |
|  | ) |
| *Plaintiffs,* | ) |
|  | ) |
| **v.** | ) |
|  | ) |
| **THE UNITED STATES,** | ) |
|  | ) |
| *Defendant.* | ) |
|  | ) |

*Mark R. Cuker*, Cuker Law Firm, LLC, Philadelphia, PA, for plaintiffs.

*Frank J. Singer*, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, for defendant.  With him at trial and on the briefs were *Taylor N. Ferrell*, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, and *Karrin Minott*, Naval Litigation Office, Office of the General Counsel, Department of the Navy; also on the briefs was *Jean E. Williams*, Deputy Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Washington, DC.

## OPINION AND ORDER

*SOLOMSON*, **Judge.**

This case presents the question of whether Defendant, the United States, owes Plaintiffs, Frank and Lisa Penna ("the Pennas"), just compensation for the taking of their property (the "Property" or "Penna Property") due to chemical contamination the Department of the Navy allegedly caused.  Before the Court is the government's pending motion for judgment on partial findings pursuant to Rule 52(c) of the Rules of the United States Court of Federal Claims ("RCFC").  ECF No. 134 ("Def. 52(c) Mot.").  At trial, the Pennas presented evidence in support of their allegation that the government caused fluorosurfactant-based aqueous film-forming foam ("AFFF") to be released onto the Penna Property, which, they assert, constitutes a compensable taking pursuant to the Fifth Amendment of the United States Constitution and the Tucker Act,

28 U.S.C. § 1491.  The Court ultimately suspended trial to consider the government's RCFC 52(c) motion, arguing that the Pennas did not prove a compensable taking.  ECF No. 125; Def. 52(c) Mot. at 9.

Although the Pennas attempt to shoehorn their takings claim into the legal framework applicable to direct, physical *per se* appropriations of property, the United States Supreme Court and the United States Court of Appeals for the Federal Circuit have issued a line of decisions that specifically address takings based upon alleged government-caused flooding and that, by extension, apply to chemical contamination cases.  Those cases govern the outcome here.  In that regard, after considering the evidence the Pennas presented at trial, the Court concludes that they have failed to carry their burden of proof and, thus, the government is entitled to judgment.  In addition, the Court imposes sanctions on Plaintiffs' counsel for violating discovery obligations.

## I.      PROCEDURAL HISTORY

### A. The Complaint

On November 18, 2016, the Pennas filed suit in this Court, alleging that the Navy's use of hazardous chemicals resulted in the contamination of both the Pennas' water supply and ground soil, amounting to a compensable Fifth Amendment taking of their Property.  ECF No. 1 ("Compl.")  ¶¶ 6, 26, 30.  The Pennas contend that perfluorochemical compounds ("PFCs"), including perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS"), were "used extensively at Willow Grove in fire-fighting foam materials for decades up until 2010," Compl. ¶ 8, and "deliberately channeled" by the Navy into a swale running across the Penna Property.  Compl. ¶ 24.

According to the Pennas, chronic exposure to PFCs is toxic to human health and associated with many potential adverse effects, such as an increased risk of developing various cancers that could "manifest themselves months or even years" after exposure.  Compl. ¶¶ 7, 9–14.  The Pennas aver that although the Environmental Protection Agency ("EPA") has determined that PFOA and PFOS pose potential adverse effects for the environment and human health, the government failed to prevent PFC use and disposal at Willow Grove and to prevent and abate PFC contamination in water sources (including the Pennas' private well).  Compl. ¶¶ 16–17.  The Pennas allege that they used their well "for all domestic water purposes" until learning that the levels of PFOA and PFOS "far exceeded the EPA's then provisional Health Advisory Level . . . of 0.2 µg/l for PFOS and 0.4 µg/l for PFOA."  Compl. ¶ 21.

The Pennas contend that the Navy intentionally directed contaminated runoff from Willow Grove towards the Penna Property and discharged drainage from a PFC-contaminated Fire Training Area "directly onto [the Pennas'] property," rendering it virtually valueless.  Compl. ¶¶ 24, 26–27.  Accordingly, the Pennas claim that because the government's actions amounted to a taking of their Property, they are entitled to just compensation.  Compl. at 6.

## B.  Discovery And Summary Judgment Briefing

Following briefing on the parties' cross-motions for partial summary judgment, the Court held oral argument on April 3, 2019.  ECF Nos. 38, 47, 54, 61; Minute Entry, Apr. 3, 2019.  On April 4, 2019, the Court issued a written order denying both cross-motions for summary judgment.  ECF No. 64.  On May 21, 2019, the Court set a discovery schedule for the case.  ECF No. 71.

On February 5, 2020, this case was reassigned to the undersigned judge.  ECF Nos. 83, 84.  Discovery closed on March 13, 2020, *see* ECF No. 82, and the parties filed their pretrial memoranda.  ECF Nos. 88 ("Pl. Memo."), 101.

## C.  The Trial

Trial commenced on August 3, 2020 via video-conference.[1]  *See* Minute Entry, Aug. 3, 2020.  Over the course of four days, the Pennas presented testimony from three fact witnesses and three expert witnesses.

The Pennas' first witness, Mr. Tony Gilliam, testified regarding his experience working as a fire fighter and then a battalion chief at Willow Grove.  Tr. 55:24–56:15.[2]  He testified that AFFF foam was regularly used in training exercises on the Base, which included dispersing thousands of gallons of AFFF on the Base for years.  Tr. 62:5–63:24.

The Pennas next played excerpts from the video deposition of Mr. Ronald Kroop, a wastewater treatment engineer with the Air Force, who discussed what he believed "the Government actually knew in the early 1970s" about the environmental effects of

---

[1] Trial in this matter was originally scheduled to take place in May 2020 in Philadelphia, Pennsylvania.  *See* ECF No. 71.  In light of the COVID-19 pandemic, however, the Court granted the government's motion for a continuance, ECF No. 91, and vacated both the May and proposed June trial dates.  ECF No. 96 at 3; *see also Order* (Fed. Cl. Mar. 16, 2020) (Sweeney, C.J.) (restricting public access to the National Courts Building until further notice).  Thereafter, the Court set trial in this matter to be conducted virtually, via videoconference, utilizing the Cisco Webex platform.  ECF No. 116 at 1.

[2] "Tr." refers to the transcript of trial proceedings, conducted August 3–6, 2020.

AFFF. Tr. 97:11–20.[3] Mr. Kroop also described the methods he had recommended to dispose of AFFF waste, memorialized in a report he had authored in February 1974. Tr. 19:8–21:7, 105; Plaintiffs' Exhibit ("PX") 3. The Pennas relied upon Mr. Gilliam's testimony for evidence of the Navy's regular use of AFFF on the Base, and upon Mr. Kroop's testimony to support their contention that the Navy knew of the potential hazards stemming from AFFF and that the Navy did not properly dispose of the chemicals despite such knowledge.

Mr. Frank Penna testified third. Tr. 182. He described his experience with the Penna Property, including when he first learned of the PFOA and PFOS levels there (Tr. 196:25–197:4), his communication with the government regarding the issue (Tr. 201:16–203:6), and his own efforts to have testing done on the Property's soil and water (Tr. 198:15–19, 199:4–13; PX 58). Notably, when asked about the value of the Property in its current state (i.e., contaminated), Mr. Penna testified that he believed "it's not worth anything today. Zero." Tr. 208:17–21.

The Pennas also presented testimony from several experts about the impact of the contamination of the Property, including: (1) Mr. Matthew Mulhall (geology and hydrogeology); (2) Mr. Frank Cammarata (mortgages); and (3) Mr. John Hosey (property appraisal and valuation).

On August 4, 2020, Mr. Mulhall testified about the existence, extent, and foreseeability of contamination of the Penna Property resulting from the Navy's use of AFFF at the Willow Grove base.[4] Tr. 310.

Next, Mr. Cammarata opined that the presence of PFOS and PFOA on the Penna Property presented an immitigable hazard, rendering the Property ineligible for a mortgage. PX 130 at 6; Tr. 364:1–4. He based his opinion on the guidelines and regulations for residential mortgages issued by the United States Department of Housing and Urban Development ("FHA"), the United States Veterans Administration ("VA"), the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). Tr. 359:25–360:9. He also relied upon an engineering study by M2 Associates, Inc. – i.e. Mr. Mulhall's report – as well as

---

[3] Mr. Kroop unfortunately passed away in June 2020. His video deposition had been taken a year prior, however, and thus was accepted in lieu of live testimony. Tr. 19:8–11; FRE 804(a)(4) ("A declarant is considered to be unavailable as a witness if the declarant . . . cannot be present or testify at the trial or hearing because of death[.]").

[4] Mr. Mulhall experienced technical issues with his internet connection on the day he initially testified. Tr. 355:21–23; 417:15–23. Consequently, the government was not able to cross-examine him until two days later, on August 6, 2020. Tr. 612.

property appraisals provided to him by both the Pennas and the government.  Tr. 360:19–23.  In particular, Mr. Cammarata testified that "all of the departments and agencies require that once a hazard is found and noted by the appraiser, then the hazard must be mitigated or the property is not an eligible,  mortgageable property." Tr. 363:5–8.  He further opined that upon reviewing the appraisals provided to him, "neither appraiser could identify a sale of a comparably contaminated property. Without a sale showing that a comparably contaminated property is marketable, the property will not qualify [for a mortgage]."  Tr. 364:5–9.  In light of Mr. Cammarata's view that PFOA and PFOS were immitigable "hazards" within the meaning of the agencies' definitions,  *see* Tr. 372:22–373:5, he concluded that the Penna Property was not eligible for a mortgage.

Finally, Mr. Hosey opined that because the Penna Property was not mortgageable, it had no value.  PX 131 at 23; Tr. 464:17–19, 510:8-12.  Mr. Hosey generally explained his research regarding the negative effects of stigma on property value, including "the uncertainty that follows with it" and its resulting impact on potential purchasers.  Tr. 445:24–25.  Mr. Hosey ultimately conceded, however, that he did not analyze the impact, if any, of environmental stigma on the Penna Property.  Tr. 467:22–468:7.  Mr. Hosey also described the process by which he valued the Penna Property in two scenarios: the uncontaminated state (*i.e.*, absent PFOS and PFOA contamination), and as-contaminated; he referenced multiple appraisal principles and described his use of each.  *See, e.g.*, Tr. 452:22–456:12, 468:8–11.  He explained his determination of the "highest and best use" of the Penna Property, which he resolved to be residential.[5]  Tr. 452:1–4.  Mr. Hosey concluded that the Penna Property was valueless in its current state.  PX 131 at 23; Tr. 464:17–19.

### D. The Joint Stipulation

On August 3, 2020, prior to opening arguments, the government informed the Court that PX 65 — an email from the Pennas' real estate agent, regarding a potential sale of the Property — was incomplete.[6]  Later, during the government's cross-examination of Mr. Penna, the government utilized and sought to introduce into evidence certain parts of Defendant's Exhibit ("DX") 322, which included additional

---

[5] The four tests used to determine the highest and best use of a property are physical possibility, legal permissibility, financial feasibility, and maximum productivity. Once a highest and best use is determined, there are generally three approaches to valuation in appraisal science: the sales comparison approach, the income approach, and the cost approach.  Tr. 470:11–22.

[6] Tr. 11:15–19 ("[MR. FERRELL]:  PX 65[ ] that we received from Plaintiffs on Friday . . . is in a different form than what we were expecting.  We had in our files for Plaintiffs' Exhibit 65 a longer composite exhibit.").

emails (and attachments) originally produced by the Pennas along with the email constituting PX 65.  *See* Tr. 249:16–250:10.

In addition, when the government asked Mr. Penna about the attempted sale of the Property, the government relied upon PX 64, which, according to the Pennas' exhibit list, was a written sales agreement for the Property.  In fact, that document turned out to be only an excerpt of a proposed purchase agreement – an offer to buy the Property – and an altered one at that.  *See, e.g.*, Tr. 251:5–12.  On redirect, the Pennas' counsel of record, Mr. Mark Cuker, proceeded to use what appeared to be a complete copy of a proposed sales agreement, including documents that related to, but were not contained in, DX 322.  Mr. Cuker readily admitted that the apparently more complete property sales agreement was not one of the Pennas' proposed exhibits.  *See* Tr. 271:5–7 ("[MR. CUKER]: It is not in my [exhibit] binder.  I am simply using it because it's been placed in issue here, in having the witness explain the cross examination.").  In response to Mr. Cuker's assertion, the government objected on the grounds that "[t]his is the first time that we are seeing this document.  This has not been produced to the Government."  Tr. 274:22–24.

This turn of events, in the middle of trial, prompted the Court to note its concern that Mr. Cuker had not provided the government with the full version of the sales agreement Mr. Cuker displayed during his redirect examination of Mr. Penna.  Tr. 275.  Mr. Cuker hypothesized that the version of the agreement he attempted to use was not produced to the government during discovery because the document likely was not responsive to the government's discovery requests.  Tr. 275:6–9.  The Court rejected that assertion as highly improbable, and Mr. Cuker never attempted to demonstrate otherwise (*e.g.*, by referencing a particular document request).  *See* Tr. 275:10–12.

Because the Court had trouble understanding the facts, documents, and testimony surrounding what appeared to be a bona fide offer to purchase the allegedly worthless Penna Property— combined with the Court's concern about the possible failure of the Pennas to produce documents during discovery — the Court instructed the parties to meet-and-confer regarding what PX 64 and PX 65 should have included, and to determine which parts, if any, of DX 322 — or any other documents related to the offer to purchase the Property — should be admitted into evidence.  *See* Tr. 259:1–6.  Furthermore, the Court ordered Mr. Cuker to produce to the government any previously unproduced documents or emails connected to the offer to purchase the Penna Property, including the complete version of the sales agreement that Mr. Cuker used during his redirect examination of Mr. Penna.  *See* Tr. 280:12–281:7.

On August 4, 2020, and then again on August 5, 2020, the parties informed the Court that they still had not reached an agreement regarding PX 64, PX 65, DX 322, or any other documents relating to the potential sale of the Property that previously had not been disclosed during discovery.

Finally, on August 6, 2020 – during a recess of the trial proceedings – the parties filed a stipulation regarding the attempted purchase of the Penna Property (the "Stipulation").  ECF No. 124 ("Stip.").[7]  Notably, the Pennas stipulated, among other facts, that "[t]he prospective sale of the [Penna] property did *not* fail because of environmental issues."  *Id.* ¶ 31 (emphasis added).[8]  The Stipulation was necessary, at least in-part, to address prejudice to the government arising from nearly 100 new pages of documents the Pennas produced for the first time during trial, following the Court's order to do so.  Mr. Cuker contended that any untimely production was inadvertent, and, in any event, the documents were duplicative of yet others that were produced during the discovery period.  Ultimately, however, the Stipulation and the newly produced documents refute – or significantly undermine – the Pennas' central factual assertions in their pretrial Memorandum Contentions of Fact and Law regarding the nature and extent of the government's alleged taking.  *Compare* Pl. Memo. ¶ 110, *with* Stip. ¶¶ 9–30.

### E. The Parties' RCFC 52(c) Briefing

On August 6, 2020, following the close of the Pennas' case and particularly in light of the Stipulation, discussed *supra*, the Court suspended trial to permit the government to file its motion for judgment on partial findings pursuant to RCFC 52(c) and to address Mr. Cuker's potential discovery violation and other related issues.  *See*

---

[7] As part of the Stipulation, the parties agreed to the admission of ten documents into evidence. *See* ECF Nos. 124-1 – 124-10 (DX 323–332).  The Court hereby admits those exhibits into evidence to the extent they were not previously so admitted.

[8]  The parties stipulated to various facts that contradicted or undermined the Pennas' assertions in their Memorandum Contentions of Fact and Law, and other testimony.  *Compare* Stip. ¶ 1 ("On August 9, 2018, Plaintiffs' realtor, Kathi Coletti, e-mailed Plaintiffs regarding the listing of their property . . . . The e-mail states, in part, that '[t]he liens and judgments plus mortgages are so high not sure if it can go out to realtors for sale if there is no money to pay their commission.'"), *with* Tr. 243:25–244:6 ("[MR. PENNA]: [W]e gave him the [environmental] disclosures. And then I was told it got complicated for him and he backed out, after the disclosures. He didn't have the disclosures when he wanted to buy it, but I am sure that the realtor gave him those disclosures. I didn't want Lisa and I to be held responsible for anything later on down the line."); *compare also* Stip. ¶ 9 ("On August 23, 2018, two prospective buyers signed an offer to purchase the Property at a price of $725,000"), *with* Pl. Memo. ¶ 110 ("An offer for $746,000 was made[.]").

ECF No. 125; Tr. 743:23–744:3.  In a subsequent order, issued on August 10, 2020, the Court instructed the parties to address several issues in their briefs, including whether the Pennas had provided sufficient evidence at trial of a compensable taking pursuant to the Fifth Amendment of the United States Constitution and the Tucker Act.  ECF No. 125 at 5.  Additionally, the Court sought the parties' views regarding whether there had been any violations of this Court's discovery rules or professional ethics rules, including whether Mr. Cuker violated his duty of candor to the Court.  *Id.* at 5–8.

In accordance with the briefing schedule requested by both parties, *see* ECF No. 132, the government filed its motion for judgment on partial findings pursuant to RCFC 52(c) on August 28, 2020.  *See* Def. 52(c) Mot.  On September 18, 2020, the Pennas filed their response in opposition to the government's motion.  ECF No. 136 ("Pl. Resp.").  On October 2, 2020, the government filed its reply in support of its motion. ECF No. 138 ("Def. Rep.").  The Court held oral argument on October 7, 2020.  Minute Entry, Oct. 7, 2020.

## II.    FACTUAL FINDINGS[9]

### A.  The Parties And Property

The Pennas are a married couple who reside at 410 Norristown Road, Horsham, Pennsylvania 19044.  Compl. ¶ 1.  The Pennas have resided at their present address, the subject Property of their takings claim, since 1994.  *Id.* ¶ 19.  Defendant, the United States, acting through the United States Department of the Navy (the "Navy"), has owned the Naval Air Station Joint Reserve Base Willow Grove ("Willow Grove" or the "Base"), located in Horsham Township, Montgomery County in southeastern Pennsylvania, from 1942 to present.  ECF No. 7 ("Ans.") ¶ 2; JX 33 at US00051065.  The Base was operated by the Navy, in conjunction with other service branches, from 1942 to March 2011, and is now maintained by the Navy Base Realignment and Closure Program Management Office.  *Id.* ¶ 5.  The Navy's use of AFFF on the Base, the allegedly resulting contamination of the Penna Property, and the asserted adverse effects of such contamination on the value of the Property form the foundation of the Pennas' claim.

---

[9] This recitation of facts constitutes the Court's principal findings of fact in accordance with RCFC 52(a).  Other findings of fact and rulings on questions of mixed fact and law are contained in the discussion sections of this opinion, *see infra* Sections V, VI.

### B.  The Navy's Use Of AFFF On The Base And The Subsequent Contamination Of The Penna Property

AFFF is a fluorinated surfactant-based foam that the military and commercial aviation sector has been using since the early 1970s to extinguish petroleum fires.  JX 4 at US00006851; JX 19 at US00004476.  AFFF contains PFCs, which include PFOA and PFOS.  JX 33 at US00051066.  PFOA and PFOS are manmade chemicals that are used for a wide variety of residential, commercial, and industrial purposes, including clothing, food packaging, cookware, and firefighting.[10]  DX 207 at US00001923.

The relevant locations of the Base are the Fire Training Area and Building 177, the two alleged sources of PFOA and PFOS that resulted in the contamination of the Penna Property.  The Base's Fire Training Area, approximately 1,600 feet north/northeast of the Penna Property, was used for large-scale firefighting exercises.  JX 11 at US000010440; PX 128 at 13.  Building 177, approximately 1,700 feet northwest of the Penna Property, served as a hangar and maintenance facility for various military aircraft.  JX 18 at US00036111.

The Pennas allege, and the government does not dispute, that AFFF was used on the Base while it was operational.  JX 33 at US00051066; *see also* Def. 52(c) Mot. at 11.  While the parties dispute whether any AFFF contamination of the Property was intentional, foreseeable, or otherwise the direct, natural, or probable result of the government's use of AFFF,[11]  the Court declines to make a factual finding on those issues (as explained in more detail below).  Instead, the Court focuses its decision here on whether or to what extent the government interfered with the Pennas' use of their

---

[10] PFOS and PFOA are not "hazardous substances" as defined in the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") § 101(14), codified at 42 U.S.C. § 9601(14), nor are they "hazardous wastes" under the Resource Conservation and Recovery Act ("RCRA"), codified at 42 U.S.C. § 6903.  *See* JX 42 at US00066429.  PFOS and PFOA are also not considered "hazardous substances" under Pennsylvania's Hazardous Sites Cleanup Act ("HSCA"), codified at 35 Pa. Stat. Ann. § 6020.103 (West); *see Giovanni v. United States Dep't of the Navy,* 433 F. Supp. 3d 736, 746 (E.D. Pa. 2020).

[11] The parties dispute whether the contamination of the Penna Property was the direct, natural, or probable result of the Navy's use of AFFF on the Base – specifically, at the Fire Training Area and Building 177.  Plaintiffs contend that the Navy's AFFF use on the Base caused runoff water to flow downhill to the Penna Property, contaminating its soil and private well.  Compl. ¶¶ 24, 26–27.  The Navy contends, in contrast, that not only did it have physical mechanisms in place to collect contaminated water and prevent its migration, but also that the migration path of any water from the Base would not lead to the Penna Property due to the topography of the surrounding land.  ECF No. 134 at 4, 23–24.  The government instead attributes the chemicals on the Penna Property to an F-14 plane crash in 2000 that occurred 300 to 400 feet north of the Penna Property and was extinguished using AFFF.  ECF No. 101 ¶¶ 36–37.

Property or appropriated a benefit at their expense.  ECF No. 101 ¶¶ 26–27, 32–33.

In September 2011, the Navy conducted groundwater sampling for PFOA and PFOS from four monitoring wells within the Base's Fire Training Area, which revealed the presence of both compounds.  JX 33 at US00051066; PX 128 at 11.  Later, in 2014, Mr. Penna first learned about potential PFOA and PFOS contamination in the area, and, consequently, he arranged to have his Property (including a private well) tested.  Tr. 196:25–197:10.  In August 2014, Analytical Labs, a private company, performed testing that showed heightened levels of PFOA (0.298 μg/L) and PFOS (0.701 μg/L) in the Pennas' well-water.  Tr. 198:12–199:2; *see* ECF No. 136-2.  The EPA itself tested the Penna's well, which also revealed the presence of PFOA and PFOS.  Tr. 199:4–16; JX 33 at US00051066.  In 2015, the Navy provided the Pennas with a written notice that PFOS and PFOA were detected in their private well in concentrations exceeding the EPA's provisional human health advisory for drinking water.  PX 58.

Although the Pennas claimed that they had used their private well until 2014 for "drinking, watering shrubs, watering [their] trees, washing [their] vehicles, in the office, [and] filling up [their] cooler every day," Tr. 197:11–17, the Pennas' primary source of water for most of their house since 2005 came from public water; the entire house has been serviced by public water since 2010.  Indeed, while the Pennas alleged that their "water supply came entirely from a private well located on their property," and that they "used their well for all domestic water purposes until late 2014" when they received the Navy's notice, Compl. ¶¶ 20–21, the Penna Property was connected to municipal water because of inadequate water pressure, *not* due to contamination.  Tr. 215:11–216:6; Tr. 197:21–198:7.  The Navy has provided bottled drinking water to the Pennas' on-site business since 2014.[12]  Tr. 203:4–6.

### C.  Attempts To Sell The Penna Property

In 2013, prior to learning of the PFOA and PFOS contamination on the Property, Mr. Penna spoke to a realtor about potential investment opportunities involving the Property, including subdividing the land and selling the house.  Tr. 203:11–16, 204:9–205:4.  Although the Pennas halted any such plans in 2014 after the Navy notified the Pennas of the AFFF contamination, Tr. 205:5–13, the Pennas ultimately listed their

---

[12] Mr. Penna ran a landscaping business from his garage.  Tr. 231:21–25.  When Mr. Penna initially communicated with the Navy regarding the contamination on the Property, the Navy offered to pay a tapping fee to provide public water to Mr. Penna's business.  Tr. 201:16–202:11.  Because Mr. Penna would have had to bear the expense of running a line from Norristown Road to the business, the Pennas and the Navy ultimately agreed that the Navy would supply bottled water instead.  Tr. 202:14–203:6.

property for sale in 2018 after speaking with several realtors.  Tr. 206:3–9, 207:25–208:13.

Independent of any contamination, the Property suffers from several problems, including a swale that frequently floods the Property when it rains, which negatively impacts its salability.  Tr. 189:21–190:3, PX 103.  Indeed, as acknowledged by Plaintiffs' realtor, Ms. Kathi Coletti, the liens, judgments, and mortgages on the Property are "so high" that it was not clear the Property could be placed on the market.[13]  *See* Stip. ¶ 1.  Moreover, despite Mr. Penna's impression that the Property was zoned for commercial purposes, he had no written proof of such zoning.  *Id.* ¶ 2.

On August 23, 2018, prospective buyers submitted a signed, bona fide offer to the Pennas to purchase their Property at a price of $725,000.  DX 328; Stip. ¶ 9.  Notably, the offer required the Pennas' acceptance before August 25, 2018.  Stip. ¶ 12.  The Pennas did not accept the purchase offer in a timely manner, but rather allowed the offer to lapse – remarkably, at the direction of Mr. Cuker, the Pennas' counsel of record, who instructed them "to sign nothing until he review[ed]."  *Id.* ¶¶ 16, 17.  After the offer lapsed, the Pennas worked with their realtor, perhaps another attorney, and Mr. Cuker to prepare a counteroffer.  DX 332.  The counteroffer, dated August 30, 2018, consisted of a  "Marked Up" Agreement of Sale, including: (1) an *increase* in the proposed purchase price to $746,000; (2) a change in the specified zoning to residential; and (3) the addition of three attachments.  Stip. ¶¶ 21–24, 26.  The three additional attachments included: (1) an "Addendum to Agreement of Sale"; (2) "Compensation Agreement"; and (3) "Sellers [*sic*] Disclosure and Environmental Report 6/15."[14]  The cover page to the June 15, 2018 M2 Associates, Inc. Environmental Report was attached to the August

---

[13] On August 10, 2018, Ms. Coletti forwarded a title research report to the Pennas for the Property covering the period of July 1, 2005 – July 27, 2018 ("Title Report").  Stip. ¶ 3.  The Title Report identified a significant number of problems encumbering the Property: a February 8, 2018 mortgage foreclosure from Chase Bank in the amount of $643,215.55; an October 8, 2014 mortgage foreclosure from Stonebridge Bank in the amount of $265,737.75; ten liens filed by the Pennsylvania Department of Revenue dated between December 5, 2007, and July 11, 2018, totaling $35,809.95; eleven liens filed by the Pennsylvania Unemployment Compensation Fund dated between November 24, 2008, and April 26, 2018, totaling $51,589.12; and an Internal Revenue Service lien dated August 2, 2016, in the amount of $111,877.68.  *Id.* ¶¶ 4–8.

[14] The specific changes reflected in the Pennas' counteroffer were as follows: to alter paragraph 2(A) to increase the purchase price to $746,000 and to increase the second earnest money deposit from $9,000 to $30,000; to alter paragraph 5(A) to require written acceptance of all parties on or before August 31, 2018; to alter paragraph 6 to provide that zoning is "Residential R3"; to alter paragraph 32(B) to provide for "a due diligence period of 20 days for the buyer to confirm with Horsham Township that the property is permitted to be used for a Nursery and Landscape Contractors shop"; and to alter paragraph 32(A) to add the three new attachments.  Stip. ¶¶ 21–24, 26.

30, 2018 "Marked Up" Agreement of Sale. *Id*. ¶ 25. Plaintiffs also signed an undated "Environmental Addendum." *Id*. ¶ 27.

There is no documentary evidence whatsoever demonstrating that the Pennas – via their realtor, Ms. Coletti, or anyone else – actually transmitted the draft counteroffer to the prospective buyers or their real estate agent. Stip. ¶ 28. On September 12, 2018, Ms. Coletti e-mailed her clients, the Pennas, to advise them that, "[u]nfortunately [*sic*], the Buyers have decided not to go forward with the purchase of 410 Norristown Road. The [prospective buyers'] agent said it was getting to [*sic*] complicated for them." *Id*. ¶ 30. There is no evidence in the record explaining what complications the prospective buyers might have been referencing, but the critical fact is that the sale of the Penna Property did *not* fail because of environmental contamination issues. *Id*. ¶ 31. Indeed, if anything, the sale did not move forward simply because the Pennas effectively declined the purchase offer tendered to them.

## III.    JURISDICTION AND STANDARD OF REVIEW

Pursuant to the Tucker Act, this Court's primary jurisdictional statute, "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon the Constitution, . . . or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a). The Tucker Act thus "provides the Court of Federal Claims with jurisdiction over [Fifth Amendment] takings claims brought against the United States." *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1359 (Fed. Cir. 2013) (quoting *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1354 (Fed. Cir. 2006), *aff'd*, 552 U.S. 130 (2008)).

Before the Court is the government's motion for judgment on partial findings pursuant to RCFC 52(c), in which the government argues that the Pennas failed to meet their burden of proof at trial to demonstrate a compensable taking. Pursuant to RCFC 52(c), "[i]f a party has been fully heard on an issue during trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." In resolving such a motion, "the judge, as the sole trier of fact, may weigh the evidence and is not required to resolve all issues of evidence and credibility in the plaintiff's favor." *Persyn v. United States*, 34 Fed. Cl. 187, 195 (1995), *aff'd*, 106 F.3d 424 (Fed. Cir. 1996) (citations omitted). Rather, after hearing the plaintiff's evidence, the Court "determine[s] whether or not the plaintiff has convincingly shown a right to relief." *Fifth Third Bank of W. Ohio v. United States*, 56 Fed. Cl. 668, 683 (2003) (citing *Howard Indus., Inc. v. United States,* 115 F. Supp. 481, 485–86 (Ct. Cl. 1953)). "The trial may end at the close of a plaintiff's case if a plaintiff has failed to maintain its claim, RCFC 52(c), because '[a] plaintiff has no automatic right to cross-

- 12 -

examine a defendant's witnesses for the purpose of proving what the plaintiff failed to establish during the presentation of its case.'" *Columbia First Bank, FSB v. United States*, 60 Fed. Cl. 97, 101 (2004) (quoting *Cooper v. United States*, 37 Fed. Cl. 28, 35 (1996)).

"[T]he plaintiff has the burden to prove a taking occurred[.]" *CCA Assocs. v. United States*, 667 F.3d 1239, 1245 (Fed. Cir. 2011); *see also Loesch v. United States*, 645 F.2d 905, 914 (Ct. Cl. 1981) ("[T]he burden of proof rests on plaintiffs, and not on the defendant, to establish that a taking has occurred justifying the payment of just compensation." (citations omitted)). Plaintiffs have the burden of proving their case by a preponderance of the evidence. *Palm Beach Isles Assocs. v. United States*, 58 Fed. Cl. 657, 665 (2003), *aff'd*, 122 F. App'x 517 (Fed. Cir. 2005).

## IV.   FIFTH AMENDMENT TAKINGS PRINCIPLES

The Takings Clause of the Fifth Amendment guarantees the payment of just compensation when private property is "taken" for public use via inverse condemnation, as alleged here. U.S. Const. amend. V. "It protects 'private property' without any distinction between different types." *Horne v. Dep't of Agric.*, 576 U.S. 350, 358 (2015) (noting that "[t]he principle reflected in the Clause goes back at least 800 years to Magna Carta, which specifically protected agricultural crops from uncompensated takings" (citing W. McKechnie, Magna Carta, A Commentary on the Great Charter of King John 329 (2d ed. 1914))). Inverse condemnation is "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *United States v. Clarke*, 445 U.S. 253, 257 (1980). "It is a cause of action against the government to recover the value of property taken by the government without formal exercise of the power of eminent domain." *Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005) (citing *Clarke*, 445 U.S. at 257).

"Takings claims typically come in two forms: *per se* or regulatory." *Alimanestianu v. United States*, 888 F.3d 1374, 1380 (Fed. Cir. 2018). A *per se* (or "categorical") taking occurs where there is a physical invasion or appropriation of property, whether real, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427 (1982), or personal, *Horne v. Dep't of Agric.*, 576 U.S. at 352, 357. Such a "classic taking" is one "in which the government *directly appropriates* private property for its own use." *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 (2002) (emphasis added) (other alterations and internal quotation marks omitted).[15] In addition to *per se* (or

---

[15] "A permanent physical taking involves a 'permanent physical occupation of property' and is treated as a *per se* taking for which the government must pay compensation regardless of the circumstances." *Baley v. United States*, 134 Fed. Cl. 619, 660 (2017) (quoting *Loretto*, 458 U.S. at

categorical) takings, the United States Supreme Court has recognized that where a regulatory restriction "does not entirely deprive an owner of property rights," *Horne*, 576 U.S. at 364, but nonetheless goes "too far," *id*. at 360 (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393 (1922)), it may result in a regulatory taking.[16]  The Supreme Court also has treated certain types of regulatory actions as categorical takings.  For example, a categorical taking occurs when regulations "compel the property owner to suffer a physical invasion of his property" or prohibit "all economically beneficial or productive use."  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) (internal quotation marks omitted).

　　Thus, Supreme Court "precedents stake out two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537–40 (2005).  The first category requiring the payment of just compensation involves a case "where [the] government requires an owner to suffer a permanent physical invasion of her property—however minor . . . ." *Id*. (citing *Loretto*, 458 U.S. 419 (1982)).  The "second categorical rule applies to regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property."  *Lingle*, 544 U.S. at 537–40 (quoting *Lucas*, 505 U.S. at 1019 (emphasis in original)).

　　Beyond those categories, however, the Supreme Court has not "develop[ed] any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons."  *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).  Instead, the Court has relied on "ad hoc, factual inquiries into the circumstances of each particular case."  *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224 (1986) (citations omitted).  In engaging in these ad hoc, factual inquires, the Supreme Court has identified several factors used in determining whether there has been a taking:  (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the government action."  *Penn Cent. Transp. Co.*, 438 U.S. at 124; *accord Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984).  In requiring courts "to consider the 'character of the government action,' the Supreme Court in *Penn Central* recognized government action may impact property in myriad

---

441), *aff'd,* 942 F.3d 1312 (Fed. Cir. 2019).

[16] Before the Supreme Court's decision in *Pennsylvania Coal*, "the Takings Clause was understood to provide protection only against a direct appropriation of property—personal or real.  *Pennsylvania Coal* expanded the protection of the Takings Clause, holding that compensation was also required for a 'regulatory taking'—a restriction on the use of property that went 'too far.'"  *Horne,* 576 U.S. at 360 (citing and quoting *Pa. Coal Co.,* 260 U.S. at 415).

ways and what is important is the nature or substance of the government's action, as opposed to the precise form it may take." *Dimare Fresh, Inc. v. United States,* 808 F.3d 1301, 1307 (Fed. Cir. 2015) (quoting *Penn Cent. Transp. Co.,* 438 U.S. at 124).

Four years after *Penn Central,* the Supreme Court, in *Loretto v. Teleprompter Manhattan CATV Corp.,* reaffirmed the rule that a physical *appropriation* of property gives rise to a *per se* taking, without regard to other factors. *See Horne v. Dep't of Agric.,* 576 U.S. at 360 (discussing *Loretto*). In *Loretto,* the Court held that the installation of a cable box on a small corner of Loretto's rooftop was a *per se* taking, even though the property owner could still sell and economically benefit from the property. *Horne*, 576 U.S. at 363 (discussing *Loretto*, 458 U.S. at 436). That was true without regard to the claimed public benefit or the economic impact on the owner. The Court explained that such protection was justified not only by history, but also because such an intentional, physical "appropriation is perhaps the most serious form of invasion of an owner's property interests," depriving the owner of the "the rights to possess, use and dispose of" the property in the manner in which the owner sees fit. *Loretto,* 458 U.S. at 435 (internal quotation marks omitted). Thus, when there has been a physical appropriation, courts ordinarily "do not ask . . . whether it deprives the owner of all economically valuable use" of the item taken. *Tahoe–Sierra,* 535 U.S. at 323. In sum, "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the . . . owner." *Id.* at 322–23 (citing *United States v. Pewee Coal Co.,* 341 U.S. 114, 115 (1951)); *see also Lingle*, 544 U.S. at 537–40 ("The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property.").

On the other hand, "[u]nlike takings cases concerning the physical appropriation or government condemnation of property, the Supreme Court has abjured the application of rigid rules in its regulatory takings analysis." *Dimare Fresh*, 808 F.3d at 1307. Indeed, the Supreme Court has "emphasized that 'most takings claims turn on situation-specific factual inquiries,' adding 'that no magic formula enables a court to judge, in every case, whether a given government interference with property is a taking.'" *Quebedeaux v. United States*, 112 Fed. Cl. 317, 321 (2013) (quoting *Ark. Game & Fish Comm'n v. United States,* 568 U.S. 23, 31–32 (2012)). Only "in rare instances" has the Supreme Court "drawn some bright lines, giving, as examples, situations in which a permanent physical occupation of property occurs or where regulations require a property owner to sacrifice all economic benefit associated with its land." *Quebedeaux*, 112 Fed. Cl. at 321 (citing *Loretto,* 458 U.S. at 426, and *Lucas,* 505 U.S. at 1019).[17]

---

[17] In all takings cases, the object of the inquiry is essentially the same; courts are tasked with assessing how similar the governmental action is to a direct physical taking such that the

Notwithstanding that physical takings are generally considered *per se* takings, several types of *indirect* or *temporary* physical takings are subject to "situation-specific factual inquiries," *Quebedeaux*, 112 Fed. Cl. at 320–21, including alleged takings based upon government-induced flooding and, by extension, chemical contamination. *See United States v. Cress*, 243 U.S. 316, 328 (1917); *Pumpelly v. Green Bay & Miss. Canal Co.*, 80 U.S. 166, 181 (1871) (recognizing that "where real estate is [ ] invaded by superinduced additions of water . . . so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution"). Flooding cases – despite the physical nature of the alleged taking – clearly are not subject to any bright line tests. In *Arkansas Game & Fish Commission*, for example, the Supreme Court reversed a decision from our appellate court, the United States Court of Appeals for the Federal Circuit, in which the latter held that a government-induced flooding, temporary in duration, gains an automatic exemption from Takings Clause inspection. *Ark. Game & Fish*, 568 U.S. at 38. "The Court rejected this bright-line rule because it viewed the determination of whether a flood results in a takings as a case-specific, factual inquiry, emphasizing that '[f]looding cases, like other takings cases, should be assessed with reference to the 'particular circumstances of each case,' and not by resorting to blanket exclusionary rules.'" *Quebedeaux*, 112 Fed. Cl. at 324 (quoting *Ark. Game & Fish*, 568 U.S. at 37 (quoting *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 168 (1958))).

In *Arkansas Game & Fish Commission*, the Supreme Court identified several factors for courts to consider in assessing whether there has been a taking, among them: (i) the duration of the flooding; (ii) whether the invasion is intended or is the foreseeable result of authorized government action; (iii) the character of the land at issue and the owner's "reasonable investment-backed expectations" regarding the land's use; and (iv) the severity of the interference. *Ark. Game & Fish*, 568 U.S. at 38–39. The reason for the

---

plaintiff should be compensated. The Supreme Court explained the basic theory in *Lingle*, 544 U.S. at 537–40:

> Although our regulatory takings jurisprudence cannot be characterized as unified, these three inquiries (reflected in *Loretto*, *Lucas*, and *Penn Central*) share a common touchstone. Each aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights. The Court has held that physical takings require compensation because of the unique burden they impose: A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property — perhaps the most fundamental of all property interests.

application of an ad hoc, multifactor test in flooding cases is that, as *Loretto* itself recognized, "[n]ot every physical *invasion* is a taking." 458 U.S. at 435 n.12 (emphasis in original). "[T]he intermittent flooding [and other] cases reveal [that] such temporary limitations are subject to a more complex balancing process to determine whether they are a taking. The rationale is evident: they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property." *Id.* (citing *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), and *Kaiser Aetna v. United States*, 444 U.S. 164 (1979)). Thus, it is hardly surprising that the "the multi-factor approach of *Arkansas Game . . .* shares certain features of the *Penn Central* analysis." *Caquelin v. United States*, 959 F.3d 1360, 1366, 1370 (Fed. Cir. 2020) (explaining that "[g]overnment-induced flooding therefore comes within the rationale for more flexible takings standards" in "recognition of 'the nearly infinite variety of ways in which government actions or regulations can affect property interests'" (quoting *Ark. Game & Fish*, 568 U.S. at 31)).

This Court also has recognized the similarity between flooding cases and regulatory takings, with Senior Judge Bruggink insightfully observing that "flooding cases have been treated as *sui generis* in takings analysis due to their similarity to tort actions[.]" *Banks v. United States*, 138 Fed. Cl. 141, 147–48 (2018) (explaining that in *Ark. Game & Fish*, 568 U.S. 38–40, "the Court viewed temporary physical takings as similar to regulatory takings in that both involve a balancing of various factors to determine 'the existence vel non of a taking'" and that "[t]hese factors include time, foreseeability, severity, the character of the land at issue and the owner's reasonable expectations").

A takings claim based on alleged chemical contamination of real property is subject to a multifactor test similar to that employed in the flooding takings cases,[18] as a "plaintiff first must show that treatment under takings law [as opposed to tort law] is appropriate." *Moden*, 404 F.3d at 1342 (applying *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003)). The Federal Circuit explained the applicable test as follows:

> First, [the plaintiff] must show either that the government intended to invade a protected property interest or that the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the activity. Second, it must show that the invasion *appropriated a benefit to the government **at the expense of the property owner, at least by preempting the property***

---

[18] *Cf. Cary v. United States*, 552 F.3d 1373, 1377, 1380 (Fed. Cir. 2009) (noting that *Ridge Line*'s "language developed from the long history of the Supreme Court's flooding cases" and applying the test where "the government did not intend to take the landowners' land by use of an uncontrolled wildfire").

> ***owner's right to enjoy its property for an extended period of time***, *rather than merely by inflicting an injury that reduces the property's value*. If treatment under takings law is appropriate, the inverse-condemnation plaintiff must then "show that it possessed a protectable property interest in what it alleges the government has taken."

*Moden*, 404 F.3d at 1342 (emphasis added) (internal citations omitted) (citing and quoting *Ridge Line*, 346 F.3d at 1355).

With these principles in mind, the Court turns to analyzing the evidence the Pennas presented at trial.

## V.    THE COURT GRANTS THE GOVERNMENT'S RCFC 52(C) MOTION

The Court concludes that the evidence the Pennas presented at trial, at best, sketches out a possible tort, but falls far short of proving a compensable Fifth Amendment takings claim pursuant to the Federal Circuit's *Moden* and *Ridge Line* tests, which articulate the applicable legal standard for recovery in this case. Moreover, even if the Pennas had demonstrated a taking of some sort of property right, their case entirely flounders on the issue of damages (*i.e.*, just compensation). *Indep. Park Apartments v. United States*, 465 F.3d 1308, 1311 (Fed. Cir. 2006) (acknowledging "the rule that takings damages are limited to just compensation for what was taken and do not encompass consequential damages" (citing *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 711 (1999), and *Yuba Natural Res., Inc. v. United States*, 904 F.2d 1577, 1581 (Fed. Cir. 1990))).

### A.    The Pennas Failed To Prove A Compensable Taking

Before applying law to fact, we briefly summarize once again the nature of the Pennas' central, if not only, claim. It is straightforward. The Pennas assert that the government "improperly disposed of contaminants and hazardous substances" that "have invaded and contaminated Plaintiffs' property." Compl. ¶ 6. The contamination, allege the Pennas, has "left . . . their property virtually valueless." *Id.* ¶¶ 18, 27 ("The contamination of Plaintiffs' property and water supply has caused permanent and irreparable damage to Plaintiffs' property to the point where their property is virtually valueless and, therefore, amounts to a taking without just compensation."); 33.a (requesting judgment of "[c]ompensation in an amount greater than $1,000,000.00 be awarded to Plaintiffs for the taking of their property"). To be clear, the Pennas' complaint itself focuses only upon the Property as a whole and asserts that the government effectively has taken the Property's entire value. In particular, the Pennas

assert that "[b]ecause the property is permanently contaminated, not eligible for a mortgage, and there are no comparable sales of contaminated properties, it has no market value." Pl. Memo. ¶ 113.

A perennial problem in takings cases – as highlighted in the Court's summary of takings law, *supra* – is selecting the appropriate legal lens for analyzing the claims and facts at issue in a particular matter. In that regard, "[b]oth the federal district courts and [this Court] have struggled throughout the years to establish and appropriately apply a test to distinguish torts brought against the United States from constitutional takings." Alexandra K. McLain, *Choose Your Path to Recovery Against the United States: Torts v. Takings*, 22 Lewis & Clark L. Rev. 1063, 1064, 1066 (2018) ("Because takings jurisprudence is somewhat dependent on the basic elements of tort law, drawing the line between takings and torts has caused a great deal of confusion in the courts." (footnotes omitted)); *see also Hansen v. United States*, 65 Fed. Cl. 76, 79 (2005) ("One issue that has over the decades divided this court is the distinction between torts and takings under the Takings Clause of the Fifth Amendment. The distinction is important because this court has jurisdiction over taking claims under the Tucker Act, but not over tort actions." (footnotes omitted)). In *Hansen*, this Court provided a lengthy, scholarly review as part of its critique of the state of takings law:

> Despite the Serbonian Bog into which the takings jurisprudence of this court has fallen, the historical origin and application of the basic principles of takings jurisprudence reveal that there is no clear cut distinction between torts and takings. The best that can be said is that not all torts are takings, but that all takings by physical invasion have their origin in tort law and are types of governmental nuisances or, at times, trespasses.

65 Fed. Cl. at 80. While *Hansen* concluded that "resort[ing] to the historic development of takings jurisprudence is . . . essential to resolving the conundrum facing the court[,]" *id*. at 80, we may dispense with any further historical review here because the Federal Circuit has provided us with clear direction in *Ridge Line* and *Moden*, both of which reflect the Supreme Court's approach in flooding cases: they are not treated as *per se* physical takings. *Hansen*, 65 Fed. Cl. at 97 (noting that "[i]n *Ridge Line*, the Federal Circuit neatly summarized the tort-taking distinction test").[19]

---

[19] Whether we have since escaped from the proverbial bog in some narrow respect or sunken deeper into it is a question we leave for the Federal Circuit and the Supreme Court. *See Bridge Aina Le'a, LLC v. Hawaii Land Use Comm'n*, 141 S. Ct. 731 (2021) (Thomas, J., *dissenting from denial of certiorari*) (critiquing the Supreme Court's regulatory takings jurisprudence on the grounds

Like the plaintiffs in *Moden*, the Pennas "do not attempt to show that the government *actually intended* to invade a protected property interest." *Moden*, 404 at 1342 (emphasis added). Accordingly, the Pennas must show: (1) "that the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the activity"; and (2) "that the invasion appropriated a benefit to the government at the expense of the property owner, *at least by preempting the property owner's right to enjoy its property for an extended period of time*, rather than merely by inflicting an injury that reduces the property's value." *Id.* (emphasis added).[20]

In *Moden*, the Federal Circuit concluded that because there was "no genuine issue of material fact either that the government intended to contaminate the Modens' ranch or that the contamination of the Modens' ranch [was] the direct, natural, or probable result of the authorized use" of the chemical at issue, the court found "it unnecessary to address whether the contamination of the Modens' ranch preempted the Modens' right to enjoy their property for an extended period of time, rather than merely by inflicting an injury that reduces its value." 404 F.3d at 1346. The Federal Circuit similarly found "it unnecessary to address whether the Modens possessed a protectable property interest in what they allege the government has taken." *Id.*

In this case, the Court takes the opposite approach. We find it unnecessary to decide the various questions of foreseeability and causation,[21] but rather conclude that, based upon the evidence presented at trial, the Pennas failed to demonstrate that the government either appropriated a benefit at their expense or inflicted *any* concrete

---

that "nobody—not States, not property owners, not courts, nor juries—has any idea how to apply this standardless standard"). Justice Thomas continued: "These starkly different outcomes based on the application of the same law indicate that we have still not provided courts with a 'workable standard.' . . . A know-it-when-you-see-it test is no good if one court sees it and another does not." *Id.* at 731–32.

[20] These elements – adapted from *Ridge Line* – "set out a two part test that can be characterized as causation and appropriation." *Cary*, 552 F.3d at 1376–77.

[21] "[P]roof of causation, while necessary, is not sufficient for liability in an inverse condemnation case . . . In addition to causation, an inverse condemnation plaintiff must prove that the government should have predicted or foreseen the resulting injury." *Moden*, 404 F.3d at 1343.

injury or quantifiable harm in terms of their use of the Property or its value.[22]  Thus, "treatment under takings law" is unwarranted here.  *Ridge Line*, 346 F.3d at 1355.[23]

For instance, in *Ridge Line*, the government effectively "shifted some of its storm water control costs to Ridge Line."  346 F.3d at 1358.  "By covering much of its land with impervious surfaces but failing to build water retention facilities, the government . . . forced Ridge Line to build larger, more expensive control facilities in South Hollow than would otherwise have been necessary."  *Id*.  In other words, the government in that case not only avoided certain costs, but effectively transferred them to the plaintiff property owner.  The Pennas advance a similar contention, arguing that the government appropriated a benefit at the Pennas' expense by using their Property as a "receptacle for untreated AFFF wastewater," rather than "incur[ring] the time and expense to handle [the] AFFF properly."  Pl. Resp. at 8.  The Pennas presented no evidence, however, supporting the claim that the government imposed any costs on them due to AFFF contamination.  Indeed, the Pennas have not presented any evidence that the government was required to dispose of AFFF (at the time of its use) in any particular manner, as the chemicals at issue were not, and are not, identified or regulated as hazardous by CERCLA, RCRA, or Pennsylvania's HSCA.  *See* JX 42 at US00066429; *Giovanni*, 433 F. Supp. at 746 (holding that PFOS and PFOA do not constitute hazardous substances under Pennsylvania's HSCA).  ***Nor did the Pennas present any evidence regarding the necessity, requirement, or the cost of any remediation of the contamination of their Property***.

At a minimum, the Pennas must demonstrate that the government interfered with their use and enjoyment of the Property in such a way as to effectuate a taking.  *See Taylor v. United States*, 959 F.3d 1081, 1090 (Fed. Cir. 2020) (considering whether overhead flights "*directly, immediately, and substantially* interfered with the claimant's enjoyment and use of the land" (emphasis added) (citing *Brown v. United States*, 73 F.3d

---

[22] This appropriation prong, as explained at length *supra*, "developed from the long history of the Supreme Court's flooding cases."  *Cary*, 552 F.3d at 1380–81 (citing cases and explaining that "[t]o satisfy the appropriation requirement, the preemption must be sufficiently permanent that it can be said that the government has exercised dominion over the property"); *see also* Sandra B. Zellmer, *Takings, Torts, and Background Principles*, 52 Wake Forest L. Rev. 193, 205 (2017) ("Cases where temporary invasion or damage to private property results from a government action, but where the government had no actual intent to damage the property, much less to occupy it, pose the greatest difficulties for courts attempting to distinguish between a tort and a taking. Damages caused by flooding often fall within this legal purgatory.").

[23] *See Hansen*, 65 Fed. Cl. at 101 ("The real key to the distinction between mere torts . . . and takings by the government is the substantiality of the harm, not the nature of the actions leading to that harm. . . . [O]ne can imagine a theoretical continuum on which torts become takings when a certain threshold of substantial interference with property is reached.").

1100, 1102 (Fed. Cir. 1996))); *Ridge Line*, 346 F.3d 1346 at 1357 (examining "whether the government's interference with any property rights . . . was *substantial and frequent* enough to rise to the level of a taking" (emphasis added)); *cf. Argent v. United States*, 124 F.3d 1277, 1284 (Fed. Cir. 1997) (holding that when "plaintiffs complain of a peculiarly burdensome pattern of activity . . . that significantly impairs their use and enjoyment of their land, those plaintiffs may state a cause of action [for inverse condemnation]"). The Pennas have not done so.

The Pennas provide no evidence for their contention that the government substantially interfered with their use of their Property, and Mr. Penna's own testimony undermines any such assertion. For example, while the Pennas alleged that their water supply "came entirely" from their well, which was used "for all domestic purposes" until the AFFF contamination was discovered in 2014, *see* Compl. ¶¶ 20–21, the evidence is clear that the Property was connected to public water by 2010 to address a water pressure issue, and not due to AFFF contamination concerns. Tr. 215:11–216:6; Tr. 197:21–198:7. Moreover, Mr. Penna acknowledged that even after receiving sampling results from the private well, which indicated elevated levels of PFOA and PFOS, the Pennas continued to use their well to water plants on the Property and to wash their vehicles, just as they had done before. Tr. 232:6–233:12. Mr. Penna's business, operated from his garage, was similarly unaffected, as he continued to use the garage for his business and home office even after receiving testing results in October 2014. Tr. 231:21–232:5. Although the Pennas contend that the PFOS levels in the surface water constitute a loss of usefulness of the Property, they also acknowledge that they do not use the surface water, and they do not otherwise prove how contaminated surface water substantially impairs their use of the Property or its value. *See* Pl. Resp. at 10.

Moreover, the Pennas in their pretrial memorandum raised a concern about their inability to subdivide the Property, Pl. Memo. ¶ 109, but they never demonstrate that the contamination caused or created any obstacle to subdividing their Property. Tr. 205:1-13. Accordingly, the Pennas' assertion that their Property could not "be subdivided to construct town homes" because "it was impossible without getting a clean environmental bill of health" is not supported by any objective, documentary evidence. Pl. Memo. ¶ 109.

The Pennas' further assertion that "[a]n offer to purchase the Property for $746,000 was made, contingent on a $475,000 mortgage, and was then withdrawn" is false. *Id*. ¶ 110. As detailed above, the offer made to the Pennas was for $725,000, not $746,000, and it was not withdrawn but rather lapsed when the Pennas did not accept it in a timely fashion. The failed transaction had nothing to do with environmental problems, Stip. ¶ 31, and there is no evidence that it fell through because of the inability

of the would-be buyers to obtain a mortgage.[24]  To the contrary, the Pennas' real estate agent urged the Pennas to "return [the] completed paperwork asap" because "[a]s you know timing is very important[.]"  DX 324.  If anything, then, the evidence suggests that the Pennas' failure to accept the offer in a timely manner – even if that would have required some sort of environmental disclosure, *see id.* – was the cause of the transaction not proceeding.  To the extent Plaintiffs generally had trouble selling the Property, that is more explainable by Mr. Cuker's admission that "[o]bviously, there were other issues with the property, which have been brought out.  There was a zoning issue; there was a title issue."  Tr. 295:16–19.

In any event, as noted *supra*, the Pennas' case – both as a legal and evidentiary matter – "focused on loss of value [of the Property]."  Tr. 229:16-18 (Plaintiff's counsel, Mr. Cuker, noting that other alleged impacts to the Property or the Pennas' use of it "are ancillary things that don't go to the core of the case").  In particular, the Pennas' central thesis is that because "potential buyers can't obtain financing, the property can't be sold.  The property is not marketable if it's not mortgageable."  Tr. 29:1-3 (Mr. Cuker's argument).  Mr. Cuker conceded,[25] however, that Pennsylvania law does not preclude the Property from being sold even in its allegedly contaminated state.  Tr. 29:10.  Moreover, neither the Pennas themselves nor their experts provided any credible testimony to establish that the Property is not mortgageable, unsellable, or otherwise valueless.  The Pennas' own appraisal expert, Mr. Hosey, conceded that "none of the improvements to the Penna property lost their utility in the as-contaminated scenario."  Tr. 520:13–25.  While Mr. Penna testified that the family stopped gardening on the Property and stopped drinking the well water due to AFFF contamination, *see* Tr. 201:6–15, Mr. Cuker conceded that he did not "think the mere inability to garden, by itself, would rise to the level of a taking."  Tr. 229:19–230:3.  The Pennas may have made the personal decision – out of an abundance caution – to cease gardening on the Property due to concerns with surface or well water contamination, but there is little evidence supporting the necessity of that choice; in fact, the EPA specifically found that PFOS

---

[24] The Pennas similarly assert that they "have not attempted to rent their house out for domestic use, because they are concerned that it is not safe for children to play in the backyard, or for the owners to plant vegetables in the garden or drink from the well that services the garage."  Pl. Memo. ¶ 111.  The Pennas make no attempt to reconcile that purported reluctance with their attempt to sell the Property, nor do they – or any of their expert witnesses – attempt to explain the relevance of this putative fact to their overall theory of the taking here: that the contamination rendered the Property not mortgageable and thus valueless.

[25] *See Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014) ("'[A] lawyer's statements may constitute a binding admission of a party[ ]' if the statements are 'deliberate, clear, and unambiguous[.]'" (quoting *Fraternal Order of Police Lodge No. 89 v. Prince George's Cty., Md.*, 608 F.3d 183, 190 (4th Cir. 2010))).

and PFOA were unlikely to be taken up by plant roots.  DX 273.  That is not to say that the Court questions the Pennas' sincerity of concern or prudence, but their well-intentioned precaution alone does not support a takings claim.  Further, with respect to the well water, specifically, the Navy effectively remediated any issue by providing bottled water to the Penna Property following the notice of AFFF contamination.  Tr. 203:4–6.  Indeed, one of Plaintiffs' exhibits admitted into evidence at trial indicates that while the Pennas' "well water is not to be used for drinking or cooking purposes[,]" they are "already hooked up to public water" and thus "no further action is required." PX 85 (March 13, 2015 letter from Navy to Mr. Penna).[26]  And in opposing the government's pending RCFC 52(c) motion, rather than supporting with evidence their sweeping allegation that contamination interfered with their use of the Property, the Pennas merely posed a string of rhetorical questions regarding the speculative concerns a hypothetical buyer might have in purchasing a contaminated property.[27]  *See* Pl. Resp. at 10.  Such rhetorical questions do not constitute evidence.

The Pennas' experts also provided no credible testimony that contamination substantially interfered with the Pennas' use of their Property.  Tr. 520:9–25.  Indeed, Mr. Cammarata, one the Pennas' expert witnesses, testified that "heightened anxiety is *the only* reason why [he] feel[s] that PFOS and PFOA impair[] the use or enjoyment of the Penna property[.]"  Tr. 375:12-15 (emphasis added).  Mr. Cammarata is not a medical doctor or a psychologist and, further, he admitted that at least one mortgage regulator has never "associated anxiety as being incompatible with enjoyment of the property."  Tr. 376:2-5.  There is no evidence that *any* bank or regulator examines a property owner's anxiety when determining whether a property may be mortgageable. In any event, Mr. Cammarata did not examine the effects of an owner's anxiety on property value, a cause-and-effect that, if asserted, is dubious on its face.  In that regard, Mr. Cammarata admitted that "the Penna property can be used for residential purposes

---

[26] *See also* PX 57 (June 9, 2016 Letter from Horsham Township Council) ("All water proved by [Horsham Water and Sewer Authority] meets or exceeds all state and federal drinking water quality standards, and all nine of our active wells in Horsham show PFC levels significantly below the new EPA . . . [a]dvisory.").

[27] Under the heading "Plaintiffs Presented Evidence of Loss of Usefulness," the Pennas cite no substantive evidence whatsoever from the record, instead simply posing the following questions: "The Government dismisses [the PFOS contamination levels in the surface water] by saying that the Pennas do not use surface water. . . . True, but how would a prospective purchaser or renter with minor children feel about living on a property with standing water contaminated above the human health screening level?  And what lender would accept a property with such contamination as collateral for a mortgage?"  Pl. Resp. at 10.  If anything, the suggested answers to those very questions are what the Pennas were required to, but did not, prove.

despite the presence of PFOS and PFOA[,]" which of course is more consistent, if anything, with the government's view that the Property is marketable.  Tr. 376:10-14.

Mr. Cammarata ultimately concluded that because the Penna Property was contaminated by an immitigable hazard, it was not eligible for a mortgage.  Tr. 364:1–4. Notably, however, Mr. Cammarata conceded that he did not investigate whether PFOS or PFOA were present in properties near the Penna Property, nor did he know whether the owners of other properties impacted with PFOS or PFOA were nevertheless able to obtain a mortgage.  Tr. 372:6–13.  He conceded that he could not identify any loan for a single-family residence anywhere in the United States that was denied a mortgage because of the presence of PFOS or PFOA.  Tr. 379:1–6, 382:18–22, 386:16–19, 390:12–16.

On cross-examination, the government showed Mr. Cammarata a list of properties (near the Penna Property) that had been sold despite PFOA and PFOS contamination.  Tr. 398:24–399:16; PX 131 (Slide 26 of Mr. Hosey's direct testimony).[28] Mr. Cammarata conceded that, at the time he wrote his report, he had not been aware of the transactions.  Tr. 409:18–23.  Furthermore, he was unaware to what extent those properties were contaminated with PFOA and PFOS.  Tr. 410:6-10.  Mr. Cammarata attempted to distinguish the Penna Property from the properties for which buyers or owners were able to secure mortgages (despite notice of elevated PFOS and PFOA levels in their private wells) by opining that "public water would completely resolve that problem."  Tr. 399:17–400:8.  But, that fact would *not* distinguish other nearby properties from the Penna Property insofar as the latter has been connected to public water since 2010.  Tr. 197:24–198:7.  Mr. Cammarata also attempted to distinguish the comparable properties from the Penna Property on the grounds that the Penna Property has *both* a contaminated well *and* contaminated soil.  Tr. 402:24–403:10.  Mr. Cammarata conceded, however, that he had no knowledge of whether the nearby properties had contaminated soil in addition to contaminated wells.  Tr. 410:6–10.  Particularly in light of the comparable properties which clearly are mortgage eligible,  *see* PX 131 (Slide 26 of Mr. Hosey's direct testimony), the Court rejects Mr. Cammarata's conclusion that the Penna Property is not mortgageable due to contamination.

The Court finds that Mr. Cammarata made further concessions and admissions on cross-examination that devastated the credibility and reliability of his opinion.  For example, he admitted that:

- he performed no analysis of FHA, VA, Fannie Mae, or Freddie Mac transactions involving land impacted with PFOS or PFOA (Tr. 372:1-5);

---

[28] *See* Tr. 597:4-8 (admitting Mr. Hosey's presentation into evidence).

- there is no VA document "stating that the VA considers the presence of PFOS or PFOA a hazard under its regs" (Tr. 378:2-6);

- he "did not reach a conclusion as to whether there was no comparable market data available" nor did he make an "attempt to identify sales of properties affected by PFOS and PFOA" (Tr. 385:4-9);

- he does not have an opinion "on the degree to which an environmental hazard affects the value of the property" (Tr. 391:20-23); and

- he did not appraise the Penna Property (Tr. 391:24-392:1).

Finally, Mr. Cammarata agreed that even if an appraiser were to determine that there is a hazardous condition on a property, "the person applying for the mortgage . . . can demonstrate that it's not a hazard or not something that the . . . issuing bank should be concerned about" and then the bank "has the flexibility to make that decision and proceed with the loan anyhow." Tr. 415:13-21. This admission further undermines Mr. Cammarata's opinion that a buyer cannot obtain a mortgage to purchase the Penna Property. And even assuming that the contamination at issue would make the mortgage process more difficult, Mr. Cammarata did not assess the relative effect of the contamination versus the liens and other encumbrances impacting the Property.[29]

The Court finds that Mr. Hosey's testimony was equally inconsistent and unreliable as Mr. Cammarata's. Despite testifying as an appraisal expert in this matter, Mr. Hosey admitted that he did not have experience appraising property with PFOA or PFOS contamination. Tr. 466:7–12. Although Mr. Hosey described in depth the effect of stigma on property generally – presumably to bolster the Pennas' claim that they were entitled "to compensation not only for the physical taking, but for diminution in value due to stigma associated with contaminated property," *see* Pl. Memo. at 61 – Mr. Hosey readily conceded that he did ***not*** analyze the impact of environmental stigma (resulting from PFOS or PFOA contamination) on the Penna Property. Tr. 467:22–468:7 (admitting that he "did not monetize any stigma impact relation to the presence of PFOS or PFOA on the Pennas' property"). To be clear, Mr. Hosey rendered no opinion on whether stigma impacts the Penna Property or, if so, what the financial impact may be.[30] Finally,

---

[29] *See Cent. R. Co. of New Jersey v. Cent. Hanover Bank & Tr. Co.*, 29 F. Supp. 826, 828 (S.D.N.Y. 1939) (noting that a property's "actual value has been practically destroyed by the tax liens now on them"); *Resol. Tr. Corp. v. Cosgrove*, 2001 WL 64777, at *4 (E.D. Pa. Jan. 24, 2001) (noting that "tax liens on Deb–Mar's property . . . in turn made it difficult to sell Deb–Mar's assets"); *cf. Connecticut v. Doehr*, 501 U.S. 1, 11–12 (1991) (noting that "attachments, liens, and similar encumbrances" constitute "partial impairments to property rights").

[30] The Court reiterates that despite the Pennas' having argued that they are entitled "to

and just like Mr. Cammarata, Mr. Hosey was "unable to identify any property in the United States that was denied a mortgage because of PFOS or PFOA," or "that did not sell because of PFOS or PFOA." Tr. 535:17–23.

Additionally, the government successfully undercut Mr. Hosey's valuation approaches by showing that his methods contradicted or ignored many of the basic appraisal principles he had described. *See, e.g.,* Tr. 515:2-9; Tr. 522:22–526:4; Def. 52(c) Mot. at 26–32. For example, Mr. Hosey primarily used the sales comparison approach for his before-contamination valuation of the Property. Tr. 492:7–12. Mr. Hosey conceded that while "[t]he sales comparison approach typically includes techniques such as pairing, case studies, and regression analysis, which support a percent deduction to the unimpaired subject value," he had not analyzed environmental case studies in determining his after-contamination valuation for the Penna Property, nor did he perform any kind of regression analysis or a paired sales analysis for the after-contamination valuation. Tr. 526:12–527:7. Mr. Hosey also admitted that he did not calculate the independent, negative impact of the recurring flooding on the value of the Property. Tr. 580:2–18.

Mr. Hosey also failed to distinguish the Penna Property from the comparable properties that sold for consideration after the Navy issued a notice of contamination (notably, properties that the government identified, but that Mr. Hosey failed to assess as part of his appraisal).[31] Tr. 464:20–465:11. Mr. Hosey insisted that while "there [were] sales of properties that were contaminated and then moved to a public water system," in those cases "their contamination was cured, not ongoing like the Pennas." Tr. 464:20–23. He further explained that a cash buyer likely would not purchase the Penna Property and that there was no way to adequately remediate the contamination. Tr. 464:7–9, 13–15. As discussed, *supra*, the Penna Property was in fact connected to public water and thus "cured" of any contamination, according to Mr. Hosey's own standard. Furthermore, there is no evidence that the Penna Property requires any additional remediation, let alone any attempt by the Pennas to quantify the cost of such remediation; Mr. Hosey simply did not compute or otherwise account for any cost to cure the contamination. While he opined "that there is no cure for the contamination on

---

compensation not only for the physical taking [of their Property], but for diminution in value due to stigma associated with contaminated property," Pl. Memo. at 61, the Pennas presented no evidence at trial to substantiate any "diminution in value due to stigma."

[31] The government identified ten nearby properties that sold for consideration ranging between $212,000 and $620,000 despite PFOA and PFOS contamination. Tr. 549:20–550:7; PX 131 (Slide 26 of Mr. Hosey's direct testimony). Mr. Hosey acknowledged that he had not located those properties during his appraisal and instead had been shown them for the first time at his deposition. Tr. 544:23–545:13.

the Penna property" because "[t]he Pennas have no control over the contamination[,]" Tr. 516:11-15 – a point which may well qualify as a non-sequitur – Mr. Hosey is not an environmental engineer, a hydrologist, or a toxicologist.  Tr. 516:16-19.  Accordingly, the Court concludes that Mr. Hosey cannot render an opinion on the need for a cure or remediation, the feasibility of any cure or remediation, or any associated probable costs. Tr. 519:14-17 (admitting in any event that he does "not present remediation costs in [his] appraisal of the Penna property").[32]

Mr. Hosey also sought to distinguish the comparable properties the government identified by claiming that "[n]one of [those] other properties have contaminated tributaries that run through the property and overflow their banks with every heavy rain [or] . . . have soil with documented contamination." Tr. 465:2–5. But Mr. Hosey ultimately conceded that, despite his bald assertion, he was unaware of whether the other nearby properties in fact had contaminated soil or flooded in heavy rain.  Tr. 551:15–21.  Again, Mr. Hosey is not an expert in hydrology, mortgage regulations, or in conducting or reviewing appraisals of property with PFOS or PFOA.  Tr. 466:7-17. Perhaps Mr. Hosey's most critical concession, however, was that "under the highest and best use criteria, residential use of the Penna property in the after [contamination] scenario was still legally permissible" and "physically possible[.]" Tr. 507:7-14.[33]

In the end, the most damaging blow to Mr. Cammarata's and Mr. Hosey's respective opinions is the fact that they are all but circular:  the bottom line of each expert rests to a significant extent on the uncritical, wholesale acceptance of the other's conclusion.  Def. Mot. at 14-15.  Mr. Cammarata's testimony is that the Penna Property "is not an eligible, mortgageable property."  Tr. 364:1-3.  But, Mr. Cammarata "does not opine on the ability to sell a nonmortgageable property[.]"  Tr. 391:17-19; PX 130 ("I will let a qualified appraiser comment on the market value and the ability to sell a nonmortgageable property.").  The Pennas relied upon Mr. Hosey to fill in the gap; he testified that "[t]he saleability and the market value of a non-mortgageable property is very questionable . . . ."  Tr. 463:14-17.  Mr. Hosey admitted, however, that he based his

---

[32] Mr. Hosey's conclusion, in that regard, is inconsistent with that of Mr. Cammarata, who, in reliance upon Mr. Mulhall, concludes only that "**it** *may* **not be possible to remove these compounds** in the environment beneath and surrounding the Penna property . . . ."  PX 130 at 6 (italics added, bold in original).  Such speculative musings are an insufficient basis for the Court to conclude that any contamination cannot be remediated, even assuming such remediation were required for health, safety, or by law.

[33] Although Mr. Hosey during trial denied that the "residential use of the Penna property was still an economic use in the after [contamination] scenario," Tr. 507:15–24, counsel for the government impeached the witness by pointing to his deposition testimony in which he admitted that residential use was an "economically profitable . . . use of the land." Tr. 508:2–11.

"ultimate conclusion of zero market value on Mr. Cammarata's mortgagability conclusion[.]" Tr. 510:8-12; *see also* Tr. 510:13-19; PX 131 at 23. In that regard, Mr. Hosey admitted in his deposition – which the government employed at trial for impeachment purposes – that (1) "Mr. Cammarata's report, in and of itself, included a zero valuation, and [Mr. Hosey] adopted that conclusion" (Tr. 510:20-511:5), and (2) Mr. Hosey "made no attempt to verify Mr. Cammarata's conclusion that the Penna property had no market value or saleability[.]" Tr. 511:6-11; *see also* Tr. 513:6-11 (Mr. Hosey conceding that "there was nothing in [his] report that would tell the reader that [he] based [his] opinion of lack of saleability and lack of marketability on [his] experience").[34] But Mr. Cammarata never opined on market value. PX 130. Mr. Cammarata thus relies upon Mr. Hosey's testimony that the property cannot be appraised (due to contamination) in order to conclude that the property is not mortgageable, while Mr. Hosey relies upon Mr. Cammarata's testimony that the Penna Property is not mortgageable in concluding that the Property is not sellable and therefore valueless.[35] Accordingly, the Court concludes that Mr. Cammarata's and Mr. Hosey's testimonies – both individually and collectively – fall far short of proving the Pennas' case.

The Pennas' own actions with regard to the prospective sale of their Property further undermine Mr. Penna's assertion that the Property, in its contaminated state, is worth "zero." Tr. 208:17-21. Although Mr. Penna opined that the Penna Property is "not worth anything today," *id.*, the Court rejects his assessment. Indeed, on August 23, 2018, the Pennas received an offer to purchase the Property for $725,000 – an offer which they did not accept in a timely manner and, thus, allowed to lapse. While we do not know whether the sale would have closed if the Pennas had accepted the offer in a timely manner, the Pennas – during the pendency of this case, in which they claim their Property is worthless – actually returned a counteroffer to the potential buyer that was

---

[34] Additionally, Mr. Hosey references several of Mr. Cammarata's putative conclusions that the latter denies having reached. *Compare, e.g.,* Tr. 535:7–16 (Mr. Hosey's testimony that Mr. Cammarata reached all of the points listed on Mr. Hosey's slide 22), PX 131 (Slide 22 of Mr. Hosey's direct testimony) (listing six conclusions, including the statement that "[d]espite a diligent search of the market, I was not able to discover a comparable sale or listing after contamination"), *with* Tr. 392:4–6 (Mr. Cammarata's admission that he did not research comparable sales for the Penna Property). Thus, the Court agrees that "[t]o the extent that Mr. Hosey's analysis incorporates these phantom Cammarata conclusions as a factual predicate or valid assumption, Mr. Hosey's opinion is unreliable." Def. 52(c) Mot. at 15.

[35] The Pennas cite *Apple Inc.* v. *Motorola Inc.*, 757 F.3d 1286, 1320–1322 (Fed. Cir. 2014), to defend Mr. Hosey's and Mr. Cammarata's reliance upon one another in reaching their conclusions. Pl. Resp. at 25. *Apple*, however, referenced only the truism that one expert may rely on another "for expertise outside of [his] field." *Id.* at 1321. The court did *not* condone circular expert testimony devoid of independent analysis in which each expert simply relies on the opinions of the other as a predicate for his own conclusions.

more than $20,000 *higher* than the prospective buyer's offer.  Stip. at ¶ 21.  While "[i]t is the general rule that evidence of specific offers of purchase is not admissible for the purpose of establishing the reasonable market value of property," *United States v. Regents of N. M. Sch. of Mines*, 185 F.2d 389, 391 (10th Cir. 1950), "[i]t is well settled that an offer to sell property at a certain price may be proved against the owner as an admission of its value at or near the time of the offer."  *Erceg v. Fairbanks Expl. Co*, 95 F.2d 850, 854 (9th Cir. 1938) (citations omitted).  And even if the rejected purchase offer of $725,000 and the subsequent counteroffer do not definitively prove the Property's value, they are probative of what the Pennas believed their Property was worth.  Put yet differently, had the Pennas truly believed that the Property had been rendered worthless, they would have jumped at the $725,000 offer and not allowed it to lapse.  That the Pennas allowed the offer to expire – and, indeed, returned a *higher* counteroffer to the prospective buyers – demonstrates, at the very least, that not even the Pennas actually believed their Property is worthless.

The Pennas primarily rely on *Sharp v. United States*, 191 U.S. 341 (1903), for the proposition that unaccepted offers are not admissible to prove market value.  Pl. Resp. at 22–23.  The reasoning underlying the Supreme Court's decision in *Sharp* is inapposite.  In *Sharp*, the Court emphasized the fact that an offer was, "at most, a species of indirect evidence of the opinion *of the person making such offer* as to the value of the land."  *Id*. at 348 (emphasis added).  The Court thus rejected an unaccepted offer as "too uncertain, shadowy, and speculative to form any solid foundation for determining the value of the land."  *Id*. at 348–49.  The circumstances surrounding the offer to purchase the Penna Property, however, do not suffer from the same deficiencies.  In fact, the Pennas themselves employed the purchase offer as an exhibit, rather than objecting to its admissibility as the party opposing admissibility apparently did in *Sharp*.  Accordingly, the Pennas have waived any objection to the admissibility of the offer.  *See* Def. Rep. at 20 ("[T]here are no questions of admissibility here, as the parties jointly prepared and filed the stipulation, and all of its referenced documents are already part of the factual record.").  The Court thus concurs with the government that the Court may consider those documents "probative of whether Plaintiffs have met their burden of showing that the property is 'virtually valueless,' and specifically may consider it probative of the truthfulness of Mr. Penna's testimony and the credibly of Mr. Hosey's analysis . . . ."  *Id*. at 21.

Even if the Pennas had not waived such an admissibility objection, however, the offer would be admissible in any event in the instant case.  In that regard, *Sharp* recognized that, depending upon the circumstances, a purchase offer may be admissible.  *Id*. at 349 ("To be of the slightest value as evidence in any court, an offer must, of course, be an honest offer, made by an individual capable of forming a fair and

intelligent judgment, really desirous of purchasing, entirely able to do so, and to give the amount of money mentioned in the offer, for otherwise the offer would be but a vain thing."); *see also Nat'l Exch. Bank & Tr. Tr. for Fife Fam. Tr. A v. Petro-Chem. Sys., Inc.,* 2013 WL 12180537, at *7 (E.D. Wis. Oct. 7, 2013) (explaining that "*Sharp* addressed the admissibility of "[o]ral and not binding offers," and distinguishing *Sharp* where "the offers were written and, if accepted, binding upon the parties").  In the instant case, to employ language from *Sharp*, "the owner himself, while declining the offer, really believed in the good faith of the party making it, and in his ability and desire to pay the amount offered," as opposed to having been "regarded as a mere idle remark, not intended for acceptance . . . ."  191 U.S. at 349.  Again, at a minimum, the bona fide purchase offer is relevant here to show what the *Pennas themselves* believed regarding the value of their Property at the time they received the offer, allowed it to lapse, and then countered with a higher amount – all of which occurred while this case was pending, and during which time the Pennas consistently have claimed their Property is valueless.  *See Republican Newspaper Co. v. Nw. Associated Press,* 51 F. 377, 379 (8th Cir. 1892) ("[T]he fact [is] that when such property is for sale [and] parties are ready to buy it[,] [it] shows that it has a value, and the price offered tends to prove what such value is. In other words, proof of offers to purchase at given prices, made in good faith, is some evidence of the actual value of the article sought to be purchased, as well as of its salability."); *50–Off Stores, Inc. v. Banques Paribas (Suisse), S.A.*, 180 F.3d 247, 255 (5th Cir. 1999) (offer for a significant amount of shares from a "legitimate buyer" appropriately considered by jury in assessing damages); *In re Grueneich*, 400 B.R. 680, 687 (B.A.P. 8th Cir. 2009) ("an offer to purchase an asset would normally constitute strong evidence of the asset's value, even if there is only one such offer made"); *Ner Tamid Congregation of N. Town v. Krivoruchko*, 2009 WL 10696538, at *7 (N.D. Ill. July 9, 2009) ("whatever the appropriate measure of damages, the $2 million offer might be admissible on the question of the fair market value").

## B.  The Pennas Erroneously Rely Upon Intentional, Direct, Physical Takings Cases

Although the Pennas repeatedly concede that the *Ridge Line* framework governs this case,[36] the Pennas rely on several inapposite cases involving direct physical takings to support their contention that the government appropriated a benefit at the Pennas' expense by "channel[ing]" AFFF in the direction of the Property.  Pl. Resp. at 8.  Even assuming that characterization of the government's actions is accurate, to the extent that the Pennas continue to maintain that the government's conduct constitutes a *per se* physical taking, *see* Pl. Memo. at 61, the Court rejects that argument.  The *Ridge Line* and

---

[36] *See* Pl. Memo. at 48–49, 58–60, 62, 64, 66; *see also* Pl. Resp. at 7, 9, 15, 37.

*Moden* cases – and the similar line of flooding cases upon which *Moden* is ultimately based – provide the correct lens with which to view the Pennas' takings claim, and not the *Loretto* line of intentional, *per se* physical takings cases. As the government suggests, and the Supreme Court's decisions confirm, the Pennas' approach to the case law "seeks to swallow that distinction." Def. 52(c) Mot. at 11.[37]

In the first case the Pennas cite,[38] *Bassett New Mexico LLC v. United States,* 55 Fed. Cl. 63 (2002), the government actually conceded liability for a physical taking after the EPA deliberately stored contaminated soil on three acres of the plaintiff's property under the mistaken belief that the plaintiff had consented to such use. 55 Fed. Cl. at 66. *Bassett* is inapposite here. Not only has the government not conceded liability in this case, but also the government did not intentionally use the Penna Property for the storage of any substance, let alone a hazardous one that otherwise would have required the government to incur disposal or remediation costs. Simply put, *Bassett* involved an intentional government act, resulting in a physical taking. Although, as noted above, the Court does not reach the question of foreseeability or intentionality here, the government conduct at issue in *Bassett* is not comparable to the government's conduct in this case, which is governed by the *Moden, Ridge Line*, and *Arkansas Game & Fish Commission* tests, as opposed to the direct, physical taking cases. *Bassett,* 55 Fed. Cl. at 68 ("Plaintiff alleges, and the United States concedes, that the EPA's removal action constituted an uncompensated physical taking of Bassett's property."). Moreover, even if *Bassett* somehow were applicable to the facts of this case, Senior Judge Smith in *Bassett* recognized that "compensable damages . . . require[] the Court to measure the degree to which the removal action deprived Plaintiff of the value of each use constituting the overall highest and best use of the Property before the removal action." 55 Fed. Cl. at 69. Here, in contrast, the Pennas provided no such credible evidence of compensable damages.

---

[37] As explained above, *see Banks*, 138 Fed. Cl. at 147–48, the rationale of the chemical contamination and flooding takings decisions makes them similar to, and analogues of, the regulatory takings cases. "A regulatory restriction on use that does not entirely deprive an owner of property rights may not be a taking under *Penn Central*." *Horne*, 576 U.S. at 364 ("That is why, in *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S. Ct. 2035, 64 L.Ed.2d 741 (1980), we held that a law limiting a property owner's right to exclude certain speakers from an already publicly accessible shopping center did not take the owner's property."). In *PruneYard*, "[t]he owner retained the value of the use of the property as a shopping center largely unimpaired, so the regulation did not go 'too far.'" *Horne*, 576 U.S. at 364 (quoting *PruneYard*, 447 U.S. at 83 (internal quotes omitted)). The Pennas cannot avoid *Ridge Line* and *Moden* by redefining at trial the putative property interest at issue.

[38] *See* Pl. Resp. at 8.

The Pennas cite *Waverley View Invs., LLC v. United States*, 135 Fed. Cl. 750, 798 (2018), *aff'd*, 767 F. App'x 996 (Fed. Cir. 2019), for the proposition that the government cannot unilaterally burden a plaintiff with removing governmental material – in *Waverley*, monitoring wells – placed on private property.  Pl. Resp. at 8–9.  Just like the *Bassett* decision, *Waverley* is inapposite because it, too, is a physical *per se* takings case. 135 Fed. Cl. at 799 (holding that the "Army's activities . . . effected a permanent physical taking of those portions of the Waverley View Property actually occupied by the Army-installed gravel access road and monitoring wells").  The Pennas' case is further distinguishable from *Waverley* because there is no credible evidence that the Pennas must remove or otherwise remediate the AFFF on their Property.  In fact, the only evidence addressing the issue is Mr. Mulhall's unsupported opinion (and Mr. Hosey's subsequent adoption of it) that "[i]mpacted groundwater, surface water, soils, and sediments must be removed."  Tr. 351:16–17.  Mr. Mulhall, however, is a geologist and hydrogeologist and thus is not qualified to opine on the necessity of removing particular substances.[39]  As the record stands, the Pennas failed to provide any credible evidence not only of the necessity of removing the contamination, but also any cost they incurred or would have to incur in order to do so.[40]  In fact, as noted above, the Pennas at times argue that the contamination cannot be remediated.  *See, e.g.*, Tr. 464:13–16; Tr. 519:10–13 ("MR. SINGER: And in your appraisal, you do not present remediation costs in your work, correct? MR. HOSEY: Because the subject property cannot be remediated by the subject property owners.").

Finally, the Pennas rely on *Hendler v. United States*, 952 F.2d 1364, 1375 (Fed. Cir. 1991), for the proposition that an individual has the right to exclude "free riders" (*i.e.*, the government) from his or her property.  Pl. Resp. at 8–9.  This is yet another case in which monitoring wells were placed on private property.  *Hendler*, 952 F.2d at 1377 ("When the governmental intrusion is as substantial a physical occupancy of private property as this is, *Loretto* establishes that there is a taking.").[41]  Unlike *Hendler*, the

---

[39] *See* Tr. 613:9–14 (Mr. Mulhall admits that he is a not a licensed toxicologist and does not have a wastewater engineering license).

[40] If the Pennas had provided credible expert testimony that, as a matter of law, the PFOS and PFOA were considered so toxic that their removal was required in order for the Property to be inhabitable, or if the Pennas had provided credible evidence that it was prudent to do so in light of their potential hazard (and provided some evidence of the likely cost), the result of this case may well have been different.

[41] The Pennas also cite *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1356 (Fed. Cir. 2006), for the proposition that a property owner has the right to exclude others from his or her land, but that case is similarly distinguishable.  Moreover, even if the case law supported equating the contamination of the Penna Property with a physical invasion resulting from the intentional storage of chemicals on their Property, the Pennas failed to quantify (or even to attempt to quantify) the value of such "storage."

instant case is not subject to a *Loretto* analysis, an approach which would be contrary to *Ridge Line* and *Moden* (and the Supreme Court's similar analysis in flooding cases). *See Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1355, 1357 (Fed. Cir. 2002) (explaining that "[o]ur decision in *Hendler* rested squarely upon the permanent nature of the wells and the regular government intrusions to monitor them" and that "*Hendler*'s holding was unremarkable and quite narrow: it merely held that when the government enters private land, sinks 100–foot deep steel reinforced wells surrounded by gravel and concrete, and thereafter proceeds to regularly enter the land to maintain and monitor the wells over a period of years, *a per se taking under Loretto has occurred*" (emphasis added)). In sum, the Court concludes that, under the appropriation prong of *Ridge Line* and *Moden*, the Pennas have failed to demonstrate any substantial impact to their use of the Property or any concrete economic impact from the contamination at issue.

### C. The Pennas Failed To Prove "Just Compensation" For Their Property As A Whole (Or Any Property Right)

In terms of the property right the Pennas claim was taken by the government, the Pennas present this Court (and the government) with a moving target. While the Pennas focused almost the entirety of their case at trial on the value of the Property as a whole, the Pennas argued, in their opposition to the government's RCFC 52(c) motion, that the property right taken by the government "is the plaintiffs' right to exclude the Government's chemicals from their property." Pl. Resp. at 7.[42] Similarly, in their pretrial brief, the Pennas allege that "[c]ontamination of the well alone is a cognizable taking," *see* Pl. Memo. at 66, but never explain how their use of the well was impaired aside from an inability to drink the water (which the Navy cured by providing bottled water). Nor, for that matter, did the Pennas offer any evidence quantifying the damages associated with any alleged interference with the use of any part of the Property, apart from contending that contamination renders the entire Property as a whole worthless.

Regardless of which, if any, specific property right the Pennas ultimately claim was taken, the Pennas failed to present any credible evidence of the value of that right (*i.e.*, whether the Pennas point to the ability to use their Property for gardening or their

---

[42] The Court agrees with the government that this claim does not properly address the case law, the government's arguments, or the Court's question regarding Plaintiffs' definition of the property or scope of property rights that they allege were taken. Instead, as the government explains, "Plaintiffs, rather than addressing the United States' argument, answer the Court's questions with a tautology: according to Plaintiffs, the invasion of the 'the Government's chemicals' resulting in a taking of Plaintiffs' property right to 'exclude the Government's chemicals from their Property.'" Def. Rep. at 20 (quoting Pl. Resp. at 7). As noted above, the Court rejects the Pennas' approach to the takings jurisprudence that governs the outcome here.

right to exclude chemicals from their land).  In that regard, the Federal Circuit has held that "the trial court in a takings case is not obligated to fashion its own award when a plaintiff has not provided evidence sufficient to determine just compensation with reasonable certainty." *Gadsden Indus. Park, LLC v. United States*, 956 F.3d 1362, 1371 (Fed. Cir. 2020); *see also Otay Mesa Prop., L.P. v. United States*, 779 F.3d 1315, 1322 (Fed. Cir. 2015) ("[T]he fact that a taking occurred does not itself establish what compensation should be awarded. What is critical in the determination of just compensation is not the gain to the government from the taking, but the actual loss to the landowner.").  Here, even assuming that the injury the Pennas claim is compensable under a Fifth Amendment takings theory, the Pennas have failed to prove the quantum of that injury necessary to assess any "just compensation" allegedly owed.

For example, in *Vaizburd v. United States*, "[t]he Court of Federal Claims concluded that the government's sand deposit on the Vaizburds' property constituted the physical taking of a permanent easement, but it denied recovery on the ground that the Vaizburds failed to establish any decline in the fair market value of their property." 384 F.3d 1278, 1279 (Fed. Cir. 2004).  The Federal Circuit agreed with this Court that "the Vaizburds [had] not established that they are entitled to recover compensation for a decline in the market value of their property," but vacated the decision and remanded "for further consideration of the Vaizburds' claim that they are entitled to recover on a cost of cure theory." *Id.* at 1280.  As in *Vaizburd*, the Pennas have failed to prove any diminution in the fair market value of their Property other than arguing that the Property is entirely worthless.  As explained above, the Court rejects the Pennas' contention that their Property is valueless.  Furthermore, the Court considered a "cost of cure theory" here, and the Pennas had ample opportunity to present such evidence, but the Pennas did not establish that remediation of the contamination is necessary, nor did the Pennas attempt to quantify the cost of such a cure.[43]

In sum, based on the trial evidence, the Court finds that the Property is marketable and potentially sellable:[44] not only have other, similar properties sold for

---

[43] The Court agrees with the government that Plaintiffs' complaint does not assert a claim for the appropriation of a flooding (or a similar) easement. *See* Def. Rep. at 2-3 n.1. The Court shares the government's multiple concerns with any suggestion that such claims had been asserted or otherwise preserved, but the Court finds in any event that the government is correct that "Plaintiffs did not offer any expert testimony suggested any alleged flooding easement reduced the value of Plaintiffs' property." *Id.*

[44] To the extent the salability of the Penna Property is impaired, that is more easily explainable by its numerous liens that would have to be cleared in a short sale, a situation for which the government is not in any way responsible. Stip. ¶¶ 3–8.

consideration – some *during the pendency of this litigation*[45] – but the Pennas themselves received a viable offer to purchase their Property, an offer which the Pennas allowed to lapse. Having found that both Mr. Cammarata's and Mr. Hosey's expert testimony is deeply flawed, the Court concludes that there is little to no evidence to support the allegation that the Property is unmarketable, not mortgageable, unsellable, or valueless in its current state. The Court thus agrees with the government that "[w]hether preemption is measured by a property's loss in usefulness or loss of market value, Plaintiffs failed to provide any credible factual support for their argument that the presence of PFOS and PFOA on their property preempted their enjoyment of their property." Def. 52(c) Mot. at 12. Aside from contending that the Property cannot be sold, the Pennas failed to offer any other theory or evidence of diminution in value, which is unsurprising given Plaintiffs' all-or-nothing approach to their case. Compl. ¶ 27 ("[The Pennas'] property is virtually valueless."). Thus, even if the government could be held liable for *some* impact to the Property under a takings theory, there is a complete lack of preponderant evidence upon which to award just compensation.

## VI.   PLAINTIFFS' COUNSEL VIOLATED THIS COURT'S DISCOVERY RULES

As noted above, following the close of Plaintiffs' case-in-chief, the Court suspended the trial proceedings due to Plaintiffs' apparent discovery violation, newly produced documents, and the parties' resulting Stipulation. In addition to issuing a schedule for the government to submit its RCFC 52(c) motion, the Court ordered the parties to address a number of questions the Court posed to better understand the impact of the newly disclosed documents, as well as the facts and circumstances surrounding the purchase offer and how Plaintiffs had described that failed purchase transaction in their discovery responses, court filings, and testimony. *See* ECF No. 125 (raising concerns about whether Plaintiffs' counsel had a possible conflict of interest in advising the Pennas about the proposed purchase of their property, whether Plaintiffs' counsel was a witness to the purchase transaction and thus to material facts central to the issue in the trial, and whether he violated his duty of candor to the Court). The Court next turns to analyzing those issues.

The Plaintiffs' pretrial memorandum includes a section of factual averments with the following heading: "The Navy substantially interfered with the use and enjoyment [of the] property, resulting in a taking for which just compensation is due." Pl. Memo. at 43 (Section IV.G, containing ¶¶ 105–16). That section lays out the heart of the

---

[45] *See* PX 131 (Slide 26 of Mr. Hosey's direct testimony (listing nearby properties, including one on the same street as the Penna Property, that sold for consideration between 2017 and 2019, and indicating associated mortgages)). This action was filed on November 18, 2016. Compl.

appropriation the Pennas had intended to prove at trial.  In particular, the Pennas explained that the government's action contaminated their Property (*id*. ¶¶ 105–06) and, as a result, the Pennas (1) "stopped using their vegetable garden" (*id*. ¶ 107), (2) "no longer use their well water for drinking, and stopped using it for outdoor cooking and barbecues" (*id*. ¶ 108), (3) could not subdivide their Property to construct town homes "without getting a clean environmental bill of health," which was "unavailable . . . because of the known contamination" and "because the full extent of the contamination is not known" (*id*. ¶ 109), and (4) "have not attempted to rent their house out for domestic use, because they are concerned that is not safe for children to play in the backyard, or for the owners to plant vegetables . . . or drink from the well that service[s] the garage" (*id*. ¶ 111).

As discussed above, those allegations at trial were either essentially abandoned or fail for a complete lack of proof (or, in the case of voluntary cessation of an activity, do not constitute support for an alleged taking in any event).  Instead, for the purpose of meeting the *Ridge Line* and *Moden* tests for a taking – and for the purposes of proving a quantum for just compensation – the Pennas relied at trial almost entirely upon the theory that "[b]ecause there is no cure for the recurrent pollution of the Penna Property[,] it is not eligible for a mortgage" and "[b]ecause the property is . . . not eligible for a mortgage, and there are no comparable sales of contaminated properties, it has no market value."  Pl. Memo. ¶ 112–14.

In that context, the Pennas explained that they would prove as follows:

> The Pennas have attempted to sell their property, without success.  At least two realtors initially refused to list the property.  In 2018, as a result of foreclosure proceedings, the property was listed for sale.  An offer for $746,000 was made, contingent on a $475,000 mortgage, and was then withdrawn.

Pl. Memo. ¶ 110.  The Pennas further averred that: (1) "[t]he property is not eligible for a mortgage and not marketable for sale"; and (2) "[t]he contamination has prevented plaintiffs from being able to mortgage or sell the property."  *Id*. at 67 (emphasis added).  The pretrial brief was signed by Plaintiffs' counsel, Mr. Cuker, and filed with the Court on March 17, 2020.

Particularly in light of the heading under which the foregoing description of the Pennas' efforts to sell the Property is located in their pretrial memorandum, the calculated purpose was to lead the Court to believe that the sale failed due to environmental contamination.  The assertion in the pretrial memorandum that the purchase offer "was . . . withdrawn" is consistent with the Pennas' interrogatory

responses, similarly executed by Mr. Cuker (transmitted to the government on or about August 30, 2019).  In that regard, in response to the government's interrogatory about "listing the property for sale or the possibilities for selling" it, the Pennas indicated that "[a]n offer was made, but the prospective buyer backed out."  ECF No. 134-3 at 6 (Response to Interrogatory No. 11).

At trial, Mr. Cuker attempted to support the allegations regarding the Pennas' inability to sell the property by eliciting the following testimony from Mr. Penna during his direct examination:

> Q.  Did you make an effort to sell the property?
>
> A.  Yes, we did.
>
> Q.  And how long was the property listed for sale?
>
> A.  The property was listed for six months.  Yes, six months.
>
> . . .
>
> Q.  And did the property sell when it was listed in 2018?
>
> A.  No, it did not.
>
> Q.  What do you think your property is worth today?
>
> A.  To me, the money and time and everything I've put into it --
>
> Q.  No, let me -- no, with the contamination, in its contaminated state, what do you think the property is worth today?
>
> A.  Well, I -- well, it's not worth anything today.  Zero.

Tr. 207:25–208:21.  Accordingly, Plaintiffs and their counsel unequivocally intended the Court (and the government) to believe that the Property did not sell and was rendered worthless because of the contamination.

The government, in contrast, attempted to show during Mr. Penna's cross-examination that although there had been a potential buyer for the Property, one reason for the failed sale may have been the "several liens" the Pennas had to disclose to the realtor.  Tr. 235:7-21.  Plaintiffs' counsel objected to the entire line of questioning as irrelevant "to the facts of this case."  Tr. 239:9-10.  The government responded that "it goes to that [Mr. Penna] had stated that he couldn't sell his property, couldn't subdivide

or do anything with his property due to the contamination, and this is showing a different alternative reason as to why a property with a potential buyer did not sell." Tr. 239:14-19. In rebuttal, Mr. Cuker essentially denied that he had opened the door to the government's cross-examination questions, but in any event withdrew his objection, stating that "I am not going to argue it here. You know, . . . if they want to suggest this is the reason the property can't sell, I will go into this with Mr. Penna on redirect examination." Tr. 240:10-23.

Continuing with the cross-examination, the government showed Mr. Penna what the government believed to be the "purchase [offer] for the property . . . in the amount of $746,000." Tr. 243:15-18. Mr. Penna readily agreed with that characterization and testified that the would-be purchaser "backed out" after the Pennas provided environmental disclosures. Tr. 243:19-244:2; *see also* Tr. 246:9-12 (Mr. Penna testifying that "after the offer and after everything that [the buyer] received . . . from us, . . . it was too complicated for him to get involved with it"); Tr. 247:6-12 (Mr. Penna testifying that after the realtor provided the would-be buyer with environmental disclosures, "that's when we got the response that it's complicated and he didn't want to buy it"); Tr. 278:5-7 (Mr. Penna testifying that after the would-be buyers "received . . . disclosures on the issues of the environment, that they didn't want to go, that it was too complicated for them").

As detailed above, *see supra* Section I.D, due to a discrepancy the Court noticed among the documents Plaintiffs' counsel employed during his examination of Mr. Penna, the Court ordered the parties to meet-and-confer regarding a possible discovery violation. Tr. 259:1–6. The resulting Stipulation demonstrates that two critical assertions in the Pennas' pretrial memorandum were false: (1) the potential buyers never offered the Pennas $746,000 for their Property; and (2) the potential buyers never withdrew their purchase offer. Instead, what actually happened is that the potential buyers made an offer to purchase the Penna Property for $725,000 which required the Pennas' acceptance by August 25, 2018, but the Pennas did not sign and accept that offer in a timely manner. Stip. ¶ 9, 12, 16. More significantly, the parties stipulated that "[t]he prospective sale of the property *did not fail because of environmental issues*." *Id*. ¶ 31 (emphasis added).

Given these falsities, the Court has serious concerns regarding whether Plaintiffs' counsel violated his duty of candor. Indeed, the clear discovery violation, for which Plaintiffs' counsel is responsible, exacerbated the impact of both the false assertions of fact and the erroneous impressions conveyed to the Court.

Pursuant to Rule 3.3 ("Candor Toward the Tribunal") of the American Bar Association's Model Rules of Professional Conduct:[46]

> (a) A lawyer shall not knowingly:
>
> (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;
>
> . . . or
>
> (3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. . . .
>
> . . .
>
> (c) The duties stated in paragraphs (a) and (b) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.

*Candor Toward the Tribunal*, Ann. Mod. Rules Prof. Cond. § 3.3 (explaining that the Rule "sets forth the special duties of lawyers as officers of the court to avoid conduct that undermines the integrity of the adjudicative process").[47]  While "[a] lawyer acting as an advocate in an adjudicative proceeding has an obligation to present the client's case with persuasive force[,] [the] [p]erformance of that duty . . . is qualified by the advocate's duty of candor to the tribunal."  *Id*.  "Consequently, although a lawyer in an adversary proceeding is not required to present an impartial exposition of the law or to vouch for the evidence submitted in a cause, the lawyer must not allow the tribunal to be misled by false statements of law or fact or evidence that the lawyer knows to be

---

[46] This Model Rule is identical to Rule 3.3 of the Pennsylvania Rules of Professional Conduct, *see* http://www.padisciplinaryboard.org/for-attorneys/rules/rule/3/the-rules-of-professional-conduct.

[47] Rule 1.6 "governs the disclosure by a lawyer of information relating to the representation of a client during the lawyer's representation of the client."  *Confidentiality of Information*, Ann. Mod. Rules Prof. Cond. § 1.6.

false." *Id.*; *see also Hanover Ins. Co. v. United States*, 146 Fed. Cl. 447, 450 (2019) (noting "the truism that attorneys must not mislead the court").

In this case, Mr. Cuker is responsible for the assertions in the pretrial memorandum and Mr. Penna's testimony – all of which appear to have been calculated to lead the Court to conclude (erroneously) that while an offer was made to the Pennas to purchase their Property for substantial value, that potential sale was tanked due to the environmental disclosures the Pennas provided. In the context of this case, no other conclusion is reasonable.[48]

First, the Court notes that the primary, if not sole, theory of the takings claim here (in terms of the appropriation-prong of the *Ridge Line* and *Moden* tests) – and the only theory for which Plaintiffs presented a damages calculation of any kind – is that the Penna Property was worthless because it was not mortgageable and thus not sellable, an assertion significantly undermined, if not completely eviscerated, due to the actual facts contained in the Stipulation.

Second, Plaintiffs falsely asserted that "[a]n offer for $746,000 was made . . . and was then withdrawn" in the context of the appropriation argument in the pretrial memorandum. Pl. Memo. ¶ 110. Mr. Cuker never corrected the record, but rather elicited testimony from Mr. Penna that the offer was for $746,000. Tr. 243:15–18. There is now no dispute that the offer, in fact, was not for $746,000 – it was for $725,000 – and that the actual offer for the lower amount was never withdrawn. Rather, it lapsed because the Pennas did not accept it. The Plaintiffs' erroneous assertions of fact thus had two consequences (until the Court and the government discovered the truth): they left the impression that a willing buyer would have valued the Property at an even higher amount, and that environmental concerns doomed the transaction. Again, neither of those things are true, something Plaintiffs now admit.

Third, Mr. Cuker's defense of his actions in both his filings and at trial provides this Court with more confidence – not less – that his conduct is problematic to say the

---

[48] As in many areas of the law, "context is everything" here. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 589 (1994) (fair use under copyright law); *see also Gissin v. Endres*, 739 F. Supp. 2d 488, 506 (S.D.N.Y. 2010) (noting that "context is everything" in securities case involving allegations of false and misleading statements); *United States v. Baynes*, 369 F. App'x 365, 367 (3d Cir. 2010) ("context is everything when distinguishing between a threat of death and threats of violence in general"); *Chapman v. Target Corp.*, 2020 WL 8093566, at *1 (D. Colo. Oct. 20, 2020) (noting that "context is everything" in deciding whether a party violated Rule 26 of the Federal Rules of Civil Procedure); *Ryan v. Town of Schererville, Ind.*, 2005 WL 1172614, at *10 (N.D. Ind. May 4, 2005) ("context is everything" in a sex discrimination case); *Gresham v. Meden*, 938 F.3d 847, 849 (6th Cir. 2019) ("context is everything in [statutory] interpretation").

least.  Mr. Cuker asserts that the misstatements in the pretrial memorandum "were inadvertent" and that "Plaintiffs' counsel did not knowingly make a false statement of fact . . . ."  Pl. Resp. at 38.  He further asserted that he "believes that he mistakenly included the wrong amount when preparing the Memorandum while working remotely in the early days of the pandemic . . . and misinterpreted the handwritten counteroffer . . . as having been the prospective buyer's offer."  *Id*.  The Court cannot decide whether these assertions are merely implausible or constitute yet further misrepresentations.  For starters, Mr. Cuker's pretrial memorandum is consistent with his pre-pandemic interrogatory responses that reflect a similar theme in asserting that the would-be buyers "backed out" of the proposed purchase.  ECF No. 134-3 at 6 (Response to Interrogatory No. 11).  Indeed, as explained above, the consistent, but ultimately false, narrative Plaintiffs and Mr. Cuker advanced was that the would-be buyers "backed out" of the transaction only after, and due to, the environmental disclosures.  *See* Tr. 247:6-12; Tr. 278:5-8.

There are three significant problems with the assertion that the would-be buyers "backed out" due to environmental concerns: (1) the buyers' offer expired by its own terms when the Pennas failed to accept it in a timely manner; (2) "Plaintiffs have no written evidence showing whether or when [a] counteroffer was actually transmitted. . . to the prospective buyers or their real estate agent"; and (3) Mr. Cuker himself was involved in the proposed transaction, insofar as (a) he instructed the Pennas not to sign the offer,[49] and (b) he either participated in preparing the draft counteroffer or, at the

---

[49] This fact also raises two separate, additional concerns:  (1) whether Mr. Cuker had a conflict of interest with respect to advising the Pennas regarding the potential purchase of their Property (because had the transaction proceeded, this takings case would have been all but over), and (2) whether because the failed transaction was part of Plaintiffs' case, Mr. Cuker effectively became a witness when he involved himself in the proposed transaction.  *See Conflict of Interest: Current Clients*, Ann. Mod. Rules Prof. Cond. § 1.7, cmt. 8 ("Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests."); *Conflict of Interest: Current Clients*, Ann. Mod. Rules Prof. Cond. § 1.7, cmt. 10 ("The lawyer's own interests should not be permitted to have an adverse effect on representation of a client."); *Lawyer as Witness*, Ann. Mod. Rules Prof. Cond. § 3.7, cmt. 1 ("Combining the roles of advocate and witness can prejudice the tribunal and the opposing party and can also involve a conflict of interest between the lawyer and client."); *see also Lee J. Rohn & Assocs., LLC v. Chapin*, 2018 WL 6721388, at *5 (V.I. Super. Ct. Dec. 18, 2018) (noting that the court was "leery of the ways [the attorney's] own pecuniary interest [was] tangled up with the interests of [the party] in the outcome of their dispute").  The government declines to press this issue, however, and, in the absence of any additional facts, the Court does as well.  Def. 52(c) Mot. at 47–48 ("The United States cannot identify at this time any harm or prejudice to its interests as a result of Plaintiffs' counsel's possible conflict of interest.").  Instead, the Court focuses – as does the government – on "the

very least, the realtor expressly sent it to him for his review. Stip. ¶¶ 17, 19–21, and included exhibits DX 326 (email from realtor noting that she "[r]eceived a call from [the Pennas'] attorney, he has directed them to sign nothing until he reviews"); DX 329 (realtor noting she is sending to Mr. Cuker "another email with the copy we marked up including attachments" and instructing that he should "review and make changes, as you see necessary, to protect your clients Lisa and Frank [Penna]"); DX 330 (marked-up sales agreement including environment disclosures transmitted to Mr. Cuker).[50]

Fourth, Mr. Cuker's argument during trial provides further support that he may well have acted with scienter in regard to the misrepresentations. At trial, Mr. Cuker asserted that his wording was carefully chosen:

> We have never contended that this sale fell through because of environmental issues. All we said was the sale fell through . . . . [W]e answered interrogatories on this particular issue a

---

primary prejudice to the United States" – "the nondisclosure of information about the 2018 sale negotiations and the incomplete production of the documents related to those negotiations." *Id.* at 48.

[50] Mr. Cuker inexplicably denied being involved with the putative counteroffer or knowing why the Pennas did not sign and accept the offer, *see* Tr. 691:23–692:6. Indeed, he asserted that "[t]he only communications I had with [the realtor] Ms. Coletti were she sent me the agreements, and, therefore, I was able to produce them. . . . [O]ther than that, I had no communication with Ms. Coletti." Tr. 692:9 - 692:13. There are two striking problems with that statement. The first is that it undercuts Mr. Cuker's original assertion to the Court that the documents in question likely were not produced because they were not responsive to the government's discovery requests. Tr. 275:6–9. The second problem is that the cited exhibits demonstrate that Mr. Cuker's involvement certainly *was* substantive; he did not communicate with Ms. Coletti solely for the purposes of this litigation. Indeed, that much was verified in a later (troubling) exchange with the Court:

> **THE COURT**: Let's look at [Stipulation] Exhibit 7, Defendant's Exhibit 329. . . . [D]o you recall telling Ms. Coletti that you directed the Pennas not to sign anything until you had a chance to review?
>
> **MR. CUKER**: I probably did, yes.
>
> **THE COURT**: Do you recall it?
>
> **MR. CUKER**: I think I did. I think I said that I had concerns about the sale of contaminated real estate, and I needed to make sure they were protected before any agreement went through. And then when I got the agreements, I referred the matter over to another attorney to handle the drafting of the language.

Tr. 754:17-18; 755:1-19. Thus, even when confronted with clear, documentary evidence, Mr. Cuker was frustratingly evasive.

> year ago, and in those answers to interrogatories, what we
> said was that we had an offer and the buyer backed out. That
> is all we ever said.
>
> . . .
>
> And neither I nor my client ever said that we know it fell
> through because of an environmental issue. We are not taking
> that position.

Tr. 295:1-15. But, that assertion critically ignores the context in which one of those assertions was made; *to wit, in the pretrial memorandum, in support of the Pennas' primary (if not only) takings claim that the property could not be sold due to environmental reasons*. Mr. Cuker seems to contend that because he never used those precise words, he has an escape hatch. That implied assertion is pure sophistry. *Republic Techs. (NA), LLC v. BBK Tobacco & Foods*, LLP, 2018 WL 6067252, at *3 (N.D. Ill. Nov. 20, 2018) (criticizing party as having "engaged in a tactic that is, in our view, 'too cute by half'"). Indeed, if Mr. Cuker did not intend to communicate the false narrative that the proposed transaction failed due to environment disclosures, why did he raise the transaction at all in his pretrial memorandum? After all, Mr. Cuker – not the government – put this subject at issue, both in his pretrial memorandum and in presenting Plaintiffs' case-in-chief. In that regard, before the correct and complete facts were known to the government and the Court, Mr. Cuker doubled down in his redirect examination of Mr. Penna, specifically eliciting testimony to make it appear that the transaction at issue failed due to environmental concerns. Tr. 273:19-274:2 (Mr. Cuker asking Mr. Penna about a putative counteroffer including "the environmental addendum").[51]

Fifth, it was Mr. Cuker's aforementioned line of questioning of Mr. Penna that, in part, led to the government's and the Court's learning of a possible discovery violation and, ultimately, to the Stipulation in which the true facts finally came to light. Thus, when Mr. Cuker asked Mr. Penna about what happened following the alleged environmental addendum's having been provided to the would-be purchasers – again, an asserted fact for which there is no documentary evidence – the government objected and, in response, the Court raised what turned out to be an appropriate tone of concern:

> **MS. MINOTT:** . . . This is the first time that we are seeing this
> document. This has not been produced to the Government.

---

[51] As the Court has noted, however, the parties agree that there is no documentary evidence whatsoever that any counteroffer or any environmental addendum was ever transmitted to the buyers. Stip. ¶ 28.

> So we would just ask that it be provided to us, if we could . . . be allowed to look at this material before it's submitted or before anything -- because this is the first time we are seeing this.
>
> **THE COURT:**  Mr. Cuker, if that's the case, there is going to be a problem.
>
> **MR. CUKER:**  We will certainly send it to them right now. We thought we had produced it.  If not, *it may be because it was not actually responsive to any specific discovery request*.
>
> **THE COURT:**  Oh, come on.  It's your [same] exhibit.  It's just more complete.

Tr. 274:22–275:11 (emphasis added).  Mr. Cuker never made any attempt to show that the government's discovery requests were inadequate or somehow did not cover the documents he failed to turn over to the government during discovery.

Sixth, while Mr. Cuker later asserted that his failure to provide to the government nearly one hundred documents during discovery was inadvertent,[52] the discovery violation furthered Plaintiffs' narrative – which ultimately proved false – surrounding the purchase offer and the Pennas' having declined to accept it, the latter pursuant to Mr. Cuker's direction.  The prejudice to the government was well articulated by its counsel (which the Court quotes at length due to its importance):

> **MR. SINGER:** . . . [W]e did not receive a version of the offer. PX64 is not the offer.  It's a permutation of a counteroffer that we have seen no evidence was ever sent to the buyers, and, in fact, PX64 is what misled the United States -- and, frankly, the Court -- into believing, during Mr. Penna's testimony, that there was a sales contract [that failed] when there was none. Your Honor may recall that you asked Mr. Penna why Mr. Penna did not enforce the contract. The reason Mr. Penna did not enforce the contract is because there was no contract to enforce.  What you're seeing in PX64 is an internal write-up by the Pennas of the original sales contract that they

---

[52] Tr. 698:6–8 ("I admit, I should have produced the complete agreements, and that was an inadvertence on our part").

received.  The original sales contract did not have . . . any of the handwritten text . . . or the stamps that we see . . .

THE COURT: Mr. Singer, I'm looking at Plaintiffs' version of – [PX]64 provided to the Court . . . in their exhibit binder, and my version has the buyers' signatures, some stamps for initials without initials, and [other handwritten edits]. . . . So, I'm sorry, can you now explain – it's got the counteroffer of [$746,000], like you said, and [$725,000] is crossed out, and the counteroffer of [$746,000] is written in.  So is your point, Mr. Singer, that this is a mocked-up version of the counteroffer but isn't the offer standing alone?

MR. SINGER:  That's correct, Your Honor.

THE COURT:  And you never got th[e] [offer itself]?

MR. SINGER:  We never received -- I had never seen the clean offer, because that was why the Government was laboring under the [incorrect] assumption that the handwritten notes that Your Honor sees on page 1 of PX64, it was our understanding that those were the terms of the original offer, and it was not until supplemental production this week that we understood that the original offer did not have the handwritten text that you see under paragraph 32(a), and also did not have . . . the strike-out of the word "zoned" and the addition of "permitted to be used."  Those were all changes made in the formulation of a counteroffer.

THE COURT: Mr. Singer, when you said supplemental production, you mean the one essentially ordered by the Court during trial?

MR. SINGER:  Yes.  That's exactly what I'm referring to . . . .

THE COURT:  Okay.  There was no . . . voluntary production where someone realized that some documents were missing, some production, on the Plaintiffs' side[?]

MR. SINGER:  No.  That's correct, Your Honor.

Tr. 699:14-701:17; Def. 52(c) Mot. at 8 ("Plaintiffs' counsel's initial revelation was followed by a staggered production of additional documents that culminated in a stipulation the parties filed on August 6, 2020 . . .").

In response to Mr. Singer's explanation, Mr. Cuker argued that his discovery failure was harmless because it actually benefited the government insofar as "[t]he document we produced makes it look like the buyer, with full knowledge of the environmental problem, offered $746,000." Tr. 701:21–23; *see also* Pl. Memo. at 40. But, as the Court pointed out, "it also makes it look like . . . from the email, that the buyers backed out before the close date of the . . . acceptance period, when really the acceptance period had lapsed without the sellers signing the agreement." Tr. 702:13–17. In that regard, the Court pressed Mr. Cuker to explain "[w]hat was the point -- what were you trying to show with paragraph 110 [of the pretrial memorandum]?" Tr. 763:11–12. Mr. Cuker responded: "Well, I'm just giving *context of the history* . . . . We simply wanted to present *the evidence that didn't come out* that there was an offer and that the sale did not go through, but we did not say in here that it was withdrawn because of environmental concerns." Tr. 763:13–18 (emphasis added). The Court still does not understand how Mr. Cuker's reference to "evidence that didn't come out" addresses the Court's concern.

Moreover, Mr. Cuker's response merely begs the further question of why Plaintiffs would have any interest in providing "context" or "history" that either is irrelevant or is beneficial to the government. Admissible trial evidence, by definition, is that which is probative regarding some element of the case before the Court. Fed. R. Evid. 401. Thus, the only *reasonable* answer to the Court's question is that Mr. Cuker sought to induce the Court at least to *infer* that the failed transaction supported Plaintiffs' central claim that the Penna Property is not sellable.[53] Put differently still, the point of the erroneous assertions in the Pennas' pretrial memorandum – when considered in context, and in light of the interrogatory responses (executed long before the pandemic) and Mr. Penna's subsequent trial testimony – can only be read as averring the very thing that Mr. Cuker never said in so many words: that the offer was withdrawn because of environmental concerns. The fact that Mr. Cuker never used that formulation verbatim is immaterial, particularly where, as here, the evidence necessary to determine the whole truth was never disclosed to the government until during trial and, even then, only when ordered to do so by the Court. *Raymo v. Sec'y of Health & Hum. Servs.*, 2014 WL 1092274, at *16 (Fed. Cl. Feb. 24, 2014) (failure to "tell the whole

---

[53] Thus, the government fairly argued that "certainly the initial production that we got is not representative of what happened, and . . . we came in not having an understanding of what the . . . sequence of events were in relation to what's actually a pretty important issue at trial . . . So in that sense we were pretty unfairly disadvantaged . . . ." Tr. 435:25–436:9.

truth . . . demonstrate[s] a lack of candor"); *In re SoCal Sleep Centers, LLC*, 2016 WL 4198534, at *9 n.13 (B.A.P. 9th Cir. Aug. 8, 2016) (noting that the court was "particularly dismayed by [counsel's] argument that, despite her ethical duty of candor to the tribunal, . . . she was free to use her 'discretion' to decide when to tell the bankruptcy court the whole truth, rather than just part of the story.  A half-truth is a half-lie").

In sum, the Court agrees with the government that "Plaintiffs' production omitted at least three key documents – the buyer's original offer, the draft counter-offer, and the Plaintiffs-signed counteroffer" and thus "never answered the United States' [interrogatory] questions before introducing these documents at trial."  Def. 52(c) Mot. at 39-40 (citing and discussing DX328, DX330, and DX332).  The Court further agrees that "[t]hese three documents are critical to evaluating Plaintiffs' substantiality claims and Plaintiffs have provided no substantial justification for their failure to produce them in discovery or at any point prior to trial."  *Id.*  Indeed, Mr. Cuker did not produce the documents in question until the Court ordered him to do so.  Pl. Resp. at 33 (acknowledging supplemental production of documents during trial "[p]ursuant to court order").  The result is that the government was denied "the opportunity to explore the significance of these documents in discovery."  Def. 52(c) Mot. at 41.

To be clear, the Court is *not* criticizing Mr. Cuker for creatively arguing about what the Court should conclude based upon a proven set of facts, or for arguing about the significance of those facts within the substantive legal framework applicable in this takings case (*e.g., Ridge Line* and *Moden*) – all of which would constitute zealous advocacy by counsel.  What a lawyer may *not* do, however, is decide on the conclusion he or she wants the Court to reach, and then selectively shape and edit the facts – *i.e.*, by making erroneous factual assertions in briefs and eliciting erroneous testimony at trial – all while relying upon carefully crafted verbiage to preserve plausible deniability and failing to disclose documents that would otherwise significantly undermine the desired conclusion.

In considering whether to issue sanctions here, the Court is mindful of the rationale underlying the duty of candor, to the extent simple honesty is insufficient:

> The duty of candor is an important part of our justice system for several reasons.  First, . . . the duty of candor is an integral part of ensuring that our system of justice functions properly because first and foremost an attorney is an officer of the court, an institution whose purpose is to seek the truth in order to do justice . . . . Second, the duty of candor is important to providing clients with an attorney's "independent professional judgment" so as to not create unreasonable client

> expectations, which when dashed can undermine confidence
> in the justice system . . . . Third, the duty of candor helps
> promote judicial efficiency and avoid crowding the court's
> docket with frivolous actions.

*Bautista v. Star Cruises*, 696 F. Supp. 2d 1274, 1281 (S.D. Fla. 2010) (internal citations omitted). We are particularly cognizant of the following admonition from the United States Court of Appeals for the Fourth Circuit: "The system can provide no harbor for clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457-58 (4th Cir. 1993).

With those principles in mind, and after careful and deliberate consideration, the Court reluctantly concludes that it cannot ignore Mr. Cuker's conduct in this case. Indeed, as much as the Court and the government both wasted an inordinate amount of time discovering and deciphering facts that should never have been obscured, the Court is troubled the most, by far, about the impact of Mr. Cuker's handling of this matter on the Pennas themselves. Would the sale of the Penna Property have been successful had the Pennas been counseled differently – *i.e.*, to promptly accept the purchase offer and to provide any environmental disclosures (if necessary) simultaneously with that acceptance? Was Mr. Cuker concerned about how a successful sale would impact the viability of this case that had been pending since 2016 (and did any such concerns create a conflict)? What is the likelihood that this litigation would have ended differently but for the Stipulation that Mr. Cuker was all but compelled to negotiate with the government? If the government had been provided with all of the documentation during discovery, would a tougher deposition of Mr. Penna (and possibly Plaintiffs' experts) have convinced the Pennas that they should abandon their case, or, perhaps, at least modify their takings and damages theories (and/or trial strategy)? Would the government have improved their chances for at least partial summary judgment and possibly have avoided the expense of trial imposed on both parties? These are all questions the answers to which are unknowable, but they illustrate the harm to the Pennas, at a minimum. The harm to the government and the Court is apparent.

The Court's authority to impose sanctions given the above findings is clear:

> Many courts, including the U.S. Supreme Court, the U.S.
> Court of Appeals for the Federal Circuit, and the U.S. Court
> of Federal Claims, have held that "[a]ll judicial bodies
> inherently have the power to sanction parties, or their
> attorneys, for failure to conform to their rules or to respect
> their dignity, or for unnecessarily impeding the tribunals'

business." *Tecom, Inc. v. United States*, 2006 WL 5616336, *5 (Fed. Cl. May 4, 2006); *see also In re Bailey*, 182 F.3d 860, 864, 864 n. 4 (Fed. Cir. 1999) (citing *inter alia Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), and explaining that "[t]he United States Supreme Court and federal courts of appeals have repeatedly recognized that regulation of attorney behavior is an inherent power of any court of law and falls within the discretion of such court").

*Multiservice Joint Venture, LLC v. United States*, 85 Fed. Cl. 106, 112 (2008) (explaining that "[t]his Court's inherent authority to enter sanctions is embodied in [RCFC 11] (requiring a reasonable inquiry into statements alleged in papers filed), RCFC 16(f) (authorizing sanctions for violations of pretrial orders), RCFC 37 (authorizing sanctions for failure to cooperate during discovery), and 28 U.S.C. § 1927 (allowing the Court to impose costs upon any attorney who 'multiplies the proceedings in any case unreasonably and vexatiously')"), *aff'd*, 374 F. App'x 963 (Fed. Cir. 2010); *see also* RCFC 26(a)(1)(A), RCFC 26(e). "Although the language of RCFC 37(b) would suggest that a violation of a judicial order is necessary before imposing sanctions, 'a formal, written order is not required, where a litigant engages in abusive litigation practices.'" *Multiservice Joint Venture*, 85 Fed. Cl. at 112–13 (quoting *Dotson v. Bravo*, 202 F.R.D. 559, 570 n.68 (N.D. Ill. 2001), *aff'd*, 321 F.3d 663 (7th Cir. 2003)). Moreover, although the Court finds that both parties were harmed by the discovery violation, "[t]he Court does not merely have the inherent authority to sanction conduct designed to harm a party, but also to sanction conduct that delays and disrupts the judicial process." *Precision Pine and Timber, Inc. v. United States*, 2001 WL 1819224, *4 (Fed. Cl. Mar. 6, 2001).

All of that said, the government declines to press the duty of candor issue, *see* Def. 52(c) Mot. at 44, and thus the Court similarly does not reach that issue here. On the other hand, the government *does* seek sanctions for the discovery violation. *Id*. at 49. The Court agrees with the government that imposition of sanctions is warranted for the discovery violation,[54] and that Mr. Cuker's overall conduct may be taken into

---

[54] The Court agrees with the government that while Mr. Cuker apologizes for the discovery violation on behalf of Plaintiffs, Mr. Cuker makes no attempt to "demonstrate in their brief why their failure to disclose all of the documents . . . is not a discovery violation or why their failure was substantially justified." Def. Rep. at 23–24. The Court further agrees that Plaintiffs instead improperly attempt to "place the blame on the United States for failing to ask for something it did not know existed." *Id.* at 24. Indeed, the government correctly explained that "Plaintiffs had superior knowledge of what transpired during the 2018 negotiations, and they perpetuated that knowledge gap by failing to answer interrogatory questions, by failing to produce documents, and by misstating the facts of the negotiations." *Id.* Mr. Cuker's argument that the government should have policed his work better does not come close to qualifying as a

consideration in fashioning such sanctions. *See, e.g., Monsanto Co. v. E.I. Du Pont de Nemours & Co.*, 748 F.3d 1189, 1201 (Fed. Cir. 2014) (holding that "the district court properly exercised its discretion in imposing targeted sanctions by carefully fitting its sanctions to the conduct that it found to be improper"); *see also Adana Investing, Inc. v. Wells Fargo Bank, N.A.*, 2017 WL 3668553, at *2 (S.D. Fla. Apr. 10, 2017) ("Based on the Court's review of Defendants' **overall conduct** throughout litigation, the Court finds sanctions are warranted." (emphasis added)); *Grethen v. Clarke*, 2015 WL 13387681, at *8 (E.D. Va. Nov. 24, 2015) (finding "that the sanction of dismissal is the only appropriate sanction given Plaintiff's **overall conduct** in this litigation" (emphasis added)), *aff'd*, 672 F. App'x 300 (4th Cir. 2017); *Lyell Theatre Corp. v. Loews Corp.*, 91 F.R.D. 97, 99 (W.D.N.Y. 1981) ("The court should look to the *overall conduct* of the litigation before imposing any sanction. . . ." (emphasis added)), *aff'd*, 682 F.2d 37 (2d Cir. 1982). Accordingly, the Court orders Mr. Cuker to reimburse the government for attorney's fees, costs, and expenses arising from the time its counsel was forced to spend on: (1) reviewing the documentation Plaintiffs provided to the government during trial as a result of the Court's order to do so; (2) negotiating and preparing the resulting Stipulation to mitigate any prejudice to the government; and (3) preparing and filing the government's responses (in its RCFC 52(c) motion) to the Court's questions contained in its August 10, 2020 order.[55]

In addition, the Court finds that an adverse inference is warranted. Plaintiffs seek to avoid the results of the Stipulation, arguing that even though "the sale 'did not fail because of environmental issues[,]'" that "does **not** mean that a sale for $725,000 could have succeeded **in spite of** environmental issues." Pl. Resp. at 10 (emphasis in original). The Court will not permit Plaintiffs to now argue that the Court should infer that the sale ultimately may have failed anyhow as a result of the contamination. Given Plaintiffs' failure to disclose responsive documents consistent with this Court's discovery rules, and the resulting Stipulation, the government is entitled to an adverse inference that the sale did not fail – and *would not have* failed – due to environmental concerns. Plaintiffs cannot be permitted to avoid the implication of the Stipulation. Moreover, such an adverse inference is consistent with Mr. Cuker's admission that the documentary evidence produced during discovery "disclosed problems with zoning and liens which could have caused the deal to fail" – thus undercutting the notion that

---

substantial justification for the prejudicial discovery violation. *Council for Tribal Emp. Rts. v. United States*, 110 Fed. Cl. 244, 250 (2013) (sanctioning the government where it "had no substantial justification for its categorical refusal to respond . . . [to] discovery requests").

[55] Although the Court would be justified in permitting the government to seek costs for specific depositions that may have been less than fully productive or helpful due to the previously undisclosed documents, the Court believes that the sanction delineated herein is sufficient to deter future such conduct and, in the process, to protect the public and the Court.

any contamination somehow was the sole or "but for" cause of the Pennas' putative inability to sell their Property. Pl. Resp. at 40.[56] To be clear, the Court does not rely upon the adverse inference in granting the government's RCFC 52(c) motion, but nevertheless issues this adverse inference sanction for the sake of the completeness of the record in this case.

Because Mr. Cuker, "[and] not his client, was responsible for the untimely discovery . . . ," Mr. Cuker shall "pay the sanctions himself rather than passing the sanctions on to his client." *Canvs Corp. v. United States*, 104 Fed. Cl. 727, 734 (2012) (citing cases). "The value of the attorney's fees will be measured by the reasonable number of hours worked multiplied by the prevailing market rates, that is 'those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Id.* (quoting *Pac. Gas & Elec. Co. v. United States*, 82 Fed.Cl. 474, 487–88 (2008)); *see also Multiservice Joint Venture*, 374 F. App'x. at 966. The sanctions assessed represent the Court's attempt to compensate the government "for losses sustained due to [the] discovery violations, . . . and to deter other litigants from engaging in similar discovery abuses." *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1386 (Fed. Cir. 2013) (applying regional circuit law, and noting that "[t]he sanctions awarded bear a 'reasonable relationship' to the harm that occurred, and serve as a deterrent against similar discovery violations by future litigants" (citing *BMW of N. Am. v. Gore*, 517 U.S. 559, 580–81 (1996))); *see also K-Con Bldg. Sys., Inc. v. United States*, 106 Fed. Cl. 652, 663 (2012) (holding that "the court has even greater discretion to award costs than it does to award the default sanction because the former is not limited to discovery violations that lack substantial justification or cause harm to the opposing party").

The government and Mr. Cuker shall endeavor to stipulate to the awarded costs, expenses, attorney's fees, and a payment schedule (if warranted), and, if they so agree, shall file a joint statement listing the amount of such items with the court no later than **April 6, 2021**. In the event that the government and Mr. Cuker are unable to agree, the government shall file with the court a bill of their costs, expenses, and attorney's fees, together with any necessary explanation or supporting documentation, on or before **April 9, 2021**. Mr. Cuker shall then file his response no later than **April 23, 2021**.

* * * * *

---

[56] *See also* Def. Rep. at 5 ("The stipulation removes environmental contamination as a basis for withdrawal of the 2018 offer, and it undermines Plaintiffs' and their experts' claim that the property could not be sold.").

The Court has great sympathy for the Pennas' overall situation. And while no reasonable property owner would be pleased to learn that their land may be contaminated with potentially harmful chemicals, Plaintiffs' evidence simply does not support the claim that they have suffered a compensable taking. That is particularly true where, as here, there is almost no evidence demonstrating any actual impact of PFOS and PFOA on human health, no credible evidence demonstrating that the Property cannot be sold, and no evidence of negative environmental stigma impacting the Property's valuation. Indeed, at least one of Plaintiffs' exhibits, admitted into evidence, notes that the "EPA is working to improve its understanding of the prevalence and toxicity of these chemicals to determine *if* safe drinking water regulatory limits are needed" and that "[i]t is *not possible* to link exposure to PFOS and PFOA in water to a person's individual health issues." PX 29 (emphasis added) (explaining that "PFOS, PFOA . . . are *unregulated contaminants* that are being sampled for the first time in Public Water Systems" (emphasis added)). The Court recognizes that the science and the regulatory environment may well be evolving towards Plaintiffs' view of the contamination,[57] but the evidence presented to the Court during trial is very far from what is required to recover on their takings claim. At best, on this record, the Pennas' "claims against the government are moral, not legal." *Calvin v. United States*, 63 Fed. Cl. 468, 475 (2005).

## VII.   CONCLUSION

For the above reasons, the Pennas have failed to prove a compensable taking under the Fifth Amendment and, accordingly, the government's RCFC 52(c) motion for judgment on partial findings is **GRANTED**. Following a determination of fees, costs, and expenses, an appropriate order will be entered in this matter, instructing the Clerk to enter judgment for defendant, the United States.

It is so **ORDERED**.

s/ Matthew H. Solomson
Matthew H. Solomson
Judge

---

[57] S. Boxerman, B. Bolen and M. Morales, *Cos. Should Brace For More EPA Action On PFAS Under Biden*, Law360.com (Mar. 12, 2021), *available at* https://www.sidley.com/en/insights/publications/2021/03/cos-should-brace-for-more-epa-action-on-pfas-under-biden (last accessed Mar. 15, 2021).